**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

CASE NO: 20-CV-60633 SMITH

VINCENT J. MORRIS, STEVEN SIMMONS,
YOLANDA UPTON, and MICHAEL LUZZI, on
behalf of themselves and all others similarly
situated,

               Plaintiffs,

v.

PHH MORTGAGE CORPORATION d/b/a PHH
MORTGAGE SERVICES, on its own behalf and as
successor by merger to OCWEN LOAN
SERVICING, LLC, a New Jersey Corporation, and
OCWEN LOAN SERVICING, LLC, a Florida
Limited Liability Company,

               Defendants.

_____

**BRIEF OF AMICUS CURIAE ATTORNEYS GENERAL OF ALASKA, ARIZONA,
CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF
COLUMBIA, FLORIDA, HAWAII, IDAHO, ILLINOIS, INDIANA, IOWA, MAINE,
MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEBRASKA, NEVADA,
NEW HAMPSHIRE, NEW MEXICO, NEW YORK,  NORTH CAROLINA, OHIO,
OKLAHOMA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT,
VIRGINIA, WASHINGTON, AND WEST VIRGINIA IN OPPOSITION TO MOTION
FOR PRELIMINARY APPROVAL OF THE SETTLEMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

INTEREST OF *AMICI CURIAE* ........................................................................1

BACKGROUND ................................................................................................3

ARGUMENT ......................................................................................................4

I.    THE CURRENT PROPOSED SETTLEMENT SHOULD BE REJECTED BECAUSE IT IS NOT FAIR, REASONABLE OR ADEQUATE ....................................................4

A.    THE RELIEF PROVIDED TO CLASS MEMBERS VIOLATES VARIOUS STATES' LAWS ..............5

    1.    The Unwritten Amendment of Mortgage Contracts Violates the Statute of Frauds in Many States and Will Cause Mass Confusion ...........5

    2.    PHH Seeks the Ratification of Fees That Violate States' Laws and Regulations ................................................................8

    3.    The Unwritten, Mass Amendments Undermine Some States' Interests in Ensuring that Mortgage Contracts and Amendments are Recorded ......................................................................9

    4.    The Proposed Settlement's "Safety Valve" Provision Will Force Borrowers to Sign Documents Contrary to Their Interests ........................9

B.    With PHH Able to Charge Excessive Fees for the Life of the Loan, the One-Time Payment to Class Members is Inadequate ............................................................10

    1.    Some of the Class Members' Awards Will Go to Late Fees ....................11

    2.    Requiring Former PHH Class Members to File Claim Forms Will Result in Fewer Payments to Borrowers....................................................11

    3.    Former PHH Borrowers Are Bound by the Proposed Settlement Even If They Do Not Submit a Claim ......................................................12

    4.    Providing for Unclaimed Settlement Funds to Revert to PHH Is Unfair and Unreasonable ........................................................................13

    5.    PHH's Claim That it Would Not Permit These Forms of Payments Without Fees is Suspect ........................................................................13

    6.    For the Court to Determine Adequacy, PHH Should Reveal the Range of Payments and the Average Payment for Class Members...........14

i

C.    The Proposed Settlement Fails to Treat Class Members Equitably.......................14

1.    The Proposed Settlement Treats Current PHH Borrowers Less Favorably than Former PHH Class Members.............................................15

2.    The Proposed Settlement Penalizes Low- and Moderate-Income Consumers.................................................................................................16

II.    THE CASES RELIED ON BY THE SETTLING PARTIES, INCLUDING IN PARTICULAR, THE *MCWHORTER* SETTLEMENT, DO NOT JUSTIFY THE PROPOSED CLASS ACTION SETTLEMENT HERE .................................................................................................16

A.    Notice to the Attorneys General of the Settlement in *McWhorter*, Provided Pursuant to CAFA, Does Not Amount to State Approval of that Settlement .......17

B.    No State Approved of The *McWhorter* Settlement and the Settling Parties Misrepresent the Communications with State Regulators in *McWhorter* .............18

C.    Differences from the *McWhorter* Settlement Demonstrate Why the Proposed Settlement Terms Require Further Scrutiny .........................................................19

CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ...................................................................................4

*CFPB et al. v. Ocwen Financial Corp. et al.*,
   No. 17-cv-80495 (S.D. Fl.) ........................................................................................7

*Cibula v. Seterus Inc.*,
   No. 50-2015-CA-01090-XXXX-MB (Fla. 15th Cir. 2019)........................................8

*Figueroa v. Sharper Image Corp.*,
   517 F. Supp. 2d 1292 (S.D. Fla. 2007) ....................................................................2

*In re Salem Mortg. Co.*,
   783 F.2d 626 (6th Cir. 1986) ..................................................................................17

*McWhorter v. Ocwen Loan Servicing, LLC*,
   2019 WL 9171207 (N.D. Ala. Aug. 1, 2019) .................................................. passim

*Poertner v. Gillette Co.*,
   618 F. App'x 624 (11th Cir. 2015) .........................................................................13

*State of Alabama et al v. PHH Mortgage Corporation*,
   18-cv-00009 (D.D.C. 2018) ......................................................................................7

*Waddell v. U.S. Bank National Association*,
   395 F. Supp. 3d 676 (E.D.N.C. 2019)......................................................................9

*Wilson v. DirectBuy, Inc.*,
   2011 WL 2050537 (D. Conn. May 16, 2011).............................................................2

*Zamber v. American Airlines, Inc.*,
   2019 WL 2262914 (S.D. Fl. 2019) .........................................................................13

**FEDERAL STATUTES**

15 U.S.C.
   § 1692, *et seq.* ........................................................................................................3

28 U.S.C.
§ 1715..................................................................................................................2
§ 1715(b)..............................................................................................................2
§ 1715(f)..............................................................................................................17

**STATE STATUTES**

Texas Finance Code
§ 392.303(a)(2) ...................................................................................................8

**STATE REGULATIONS**

3 NYCRR
§ 419.5(b) ............................................................................................................8

**RULES**

Fed. R. Civ. P. 23 ........................................................................................... 14-15

Fed. R. Civ. P. 23(e) ............................................................................................2

Fed. R. Civ. P. 23 (e)(2) ......................................................................................4

Fed.R.Civ. P. 23(e)(2)(D) ...................................................................................15

**MISCELLANEOUS AUTHORITIES**

Attorney General Ashley Moody Press Release, *Attorney General Moody Secures
More Than $11 Million to Address Ocwen Mortgage Servicing and
Foreclosure Issues* (Oct. 15, 2020) ....................................................................7

CFPB, Bulletin 2020-02-Compliance Bulletin and Policy Guidance: Handling of
Information and Documents During Mortgage Servicing Transfers, 85 Fed.
Reg. 25,281 (May 1, 2020) .................................................................................6

CFPB, *CFPB Sues Ocwen for Failing Borrowers Throughout Mortgage Servicing
Process*, Press Release (April 20, 2017), ...........................................................8

Consumer Fin. Prot. Bureau, Compliance Bull. No. 2017-01 (July 31, 2017).............4

Nat'l Consumer Law Center, *Why Services Foreclose When They Should Modify
and Other Puzzles of Servicer Behavior: Servicer Compensation and Its
Consequences* (Oct. 2009) ...............................................................................11

S. REP. NO. 109-14 (2005)................................................................................. 2, 17-18

## INTRODUCTION

The proposed settlement in this case ("Proposed Settlement") shows the danger of a class action settled too quickly – here within five months of commencement and during a worldwide pandemic. Instead of providing adequate relief to almost one million borrowers nationally, the Proposed Settlement will allow Defendants, PHH Mortgage Corporation and its predecessor corporation, Ocwen Loan Servicing, LLC ("Ocwen") (collectively "PHH" and with Plaintiffs, "the Settling Parties"), to profit from excessive and likely illegal future fees that class members will be required to pay throughout the life of their mortgage loan. The Proposed Settlement purports to permit PHH – through an unwritten, mass amendment to over 650,000 mortgage contracts – to charge excessive, unnecessary and likely illegal fees to borrowers, in violation of some states' laws which prohibit these types of fees, as well as most states' statute of frauds. PHH receives all of this in exchange for a paltry, and for some class members illusory, monetary payment. Nothing could be more unfair, unreasonable or inadequate and thus, we urge the Court to reject the Proposed Settlement.

## INTEREST OF *AMICI CURIAE*

The Attorneys General of Alaska, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and West Virginia (the "Attorneys General"), in their capacity as *amici curiae*, hereby urge this Court to reject the proposed class action settlement in this case.[1] The Attorneys General investigate and take enforcement action on behalf of the public interest in their respective

---

[1] The Attorneys General submit to the Court's jurisdiction only as *amici*, and the submission of this brief is without prejudice to the States' ability to enforce and investigate claims related to the issues in dispute.

States, and they have relevant experience in bringing consumer harm to light and crafting appropriate remedies. Approximately 76% of the putative class members are residents of the States that join in this *amicus* brief.[2]

The Attorneys General perform a unique role for the Court by addressing the fairness of class action settlements. This role is recognized in the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, which requires parties to provide information to the Attorneys General about the proposed settlement before the fairness hearing. 28 U.S.C. § 1715(b). This provision "is intended to combat the 'clientless litigation' problem by adding a layer of independent oversight" and permit Attorneys General to object to inequitable settlements. S. REP. NO. 109-14, at 34 (2005).

Because of this role, courts have frequently recognized that the opposition of a number of Attorneys General weighs strongly against a proposed class action settlement. *See Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1328 (S.D. Fla. 2007) (explaining that the appearance and objection of the Attorneys General as amicus curiae "distinguishes this case from other class actions" and that "[t]he vigor and substance of the objections presented counsels against a finding favorable to the parties on this [Fed. R. Civ. P. 23(e)] factor"). Another court, rejecting a proposed class action settlement, recognized that the *amicus* brief of the Attorneys General should be viewed as "a placeholder for many absent class members' objections." *Wilson v. DirectBuy, Inc.*, 2011 WL 2050537, at *9 (D. Conn. May 16, 2011) (citing *Figueroa*, 517 F. Supp. 2d at 1328).

The Attorneys General submit this *amicus* brief because of genuine concerns about the reasonableness, adequacy and fairness of the Proposed Settlement that involve the very problems

---

[2] This percentage is based on the list of class members attached to Defendant's Motion For Finding of Compliance with the Notice Requirements of the Class Action Fairness Act, ECF Doc. 51. An estimated 713,199 of the 940,884 class members are residents of the *amicus* States.

2

Congress sought to address through CAFA. Based upon this authority, the Attorneys General set forth below their objections and respectfully request that the Court reject the Proposed Settlement.

## BACKGROUND

The class members own homes subject to mortgages[3] currently or formerly serviced by PHH. Am. Compl. (ECF Doc. 11) ¶ 1. PHH has engaged in the practice of charging certain "processing fees" or "convenience fees" when the borrowers make a payment on their mortgage over the phone with a live operator, over the phone via an interactive voice response system ("IVR"), or online. *Id.*; *see also* Stipulation of Settlement and Release ("Stipulation" or "Stip") (ECF Doc. 46-1) at 1; Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Certification of the Settlement Class ("Prel. App. Mot.") (ECF Doc. 46). No processing fees are charged if borrowers mail in a check or if borrowers sign up for automatic monthly debits from their checking accounts. Stip. at 8. The proposed class consists of 659,304 mortgage loans for 943,706 borrowers. Prel. App. Mot. at 16. Approximately 20% of the class have had their loans transferred to another mortgage servicer ("Former PHH Borrowers"); the remaining 80% are still serviced by PHH ("Current PHH Borrowers"). *Id.* at 8.

Plaintiffs allege that the processing fees charged by PHH are illegal and improper because neither the mortgages themselves nor applicable statutes authorize such fees. Am. Compl. ¶ 1. As the Settling Parties highlight in the Stipulation, the Consumer Financial Protection Bureau ("CFPB") issued guidance in 2017 illustrating how these fees could violate the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq. *See* Stip. at 2 (referencing the 2017 CFPB guidance). In that guidance, the CFPB concludes that mortgage servicers who meet the definition of "debt collector" under the FDCPA violated the Act when "they charged fees for

---

[3] Unless specified otherwise, the Attorneys General use the term "mortgage" to mean both the note and the mortgage.

taking mortgage payments over the phone to borrowers whose mortgage instruments did not expressly authorize collecting such fees and who reside in states where applicable law does not expressly permit collecting such fees."[4]

In the original complaint filed on March 25, 2020, Plaintiff Vincent Morris brought Florida consumer law and breach of contract claims that sought relief for a class limited to residents of Florida. *See generally* Compl. (ECF Doc. 1). The parties agreed to mediation in April 2020. Stip. at 3. The Settling Parties indicate they involved the plaintiffs from other lawsuits against PHH in two mediation sessions in May 2020; however, those plaintiffs declined to participate in further settlement negotiations. *Id*. On July 24, 2020, Plaintiff Morris filed an amended complaint adding a federal FDCPA claim, adding three additional Plaintiffs who reside outside Florida, and dropping the Florida-specific Consumer Collection Practice Act and unjust enrichment claims. Am. Compl. ¶¶ 16-26, 42-52. Approximately one month after Plaintiffs filed their amended complaint (and five months after they initiated the case), on August 25, 2020, the Settling Parties filed a stipulation containing proposed class action settlement terms, and Plaintiffs moved for preliminary approval. *See generally* Stip.; Prelim. App. Mot. The Settling Parties acknowledge that no federal appellate court has ruled on the legality of PHH's processing fees at issue here. Stip. at 2-3.

## ARGUMENT

### I.   THE CURRENT PROPOSED SETTLEMENT SHOULD BE REJECTED BECAUSE IT IS NOT FAIR, REASONABLE OR ADEQUATE

Before approving a proposed class action settlement, the Court must determine that a class action settlement is fair, reasonable and adequate, and is not the product of collusion. Fed. R. Civ. P. 23 (e)(2); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). The Proposed Settlement

---

[4] Consumer Fin. Prot. Bureau, Compliance Bull. No. 2017-01 at 4 (July 31, 2017), https://files.consumerfinance.gov/f/documents/201707_cfpb_compliance-bulletin-phone-pay-fee.pdf.

fails to satisfy these factors because its unwritten mass amendment permitting PHH to charge exorbitant fees is a windfall to PHH and violates most states' laws. Class members receive a nominal monetary amount in exchange for PHH's ability to profit from thousands of dollars-worth of future and likely illegal fees to be charged to these class members. The Attorneys General are also concerned about the speed with which this case was settled. This has deprived the Court – and the Attorneys General – of the ability to determine the adequacy, fairness and reasonableness of the settlement. Many of the Attorneys General's questions about the Proposed Settlement – the actual amount each borrower will receive (*see* Part I.B.6, *infra*); how much of the settlement credits go to late fees (*see* Part I.B.1, *infra*); the amount of the reverter (*see* Part I.B.4, *infra*) – are left unanswered because the discovery process was cut short.[5] In light of these factors, the Attorneys General urge the Court to reject the Proposed Settlement.

### A.   THE RELIEF PROVIDED TO CLASS MEMBERS VIOLATES VARIOUS STATES' LAWS

The crux of the Proposed Settlement is the unwritten, mass amendment of 659,304 mortgage loans (for 943,706 borrowers). Prel. App. Mot. at 16; Stip, ¶ 5.3. As proposed, this unwritten amendment purports to authorize much of PHH's current mortgage payment fee structure. For the reasons below, such amendment would violate states' laws and practices, and thus should not be approved by the Court.

    1.   The Unwritten Amendment of Mortgage Contracts Violates the Statute of Frauds in Many States and Will Cause Mass Confusion

---

[5] The Settling Parties assert that PHH produced "thousands of pages of documents" before the Proposed Settlement was reached. *See* Prel. App. Mot. at 3. However, given that this is a class that includes almost a million people, thousands of pages is not a large amount and instead indicates that inadequate information has been provided by the parties in support of the Proposed Settlement.

(Footnote Continued on Next Page)

The Settling Parties' proposal for the unwritten and mass amendment of mortgages violates the statute of frauds in most states and territories in the Union.[6]  In most states, contracts involving an interest in real property, such as mortgages and related promissory notes, must be in writing and signed by both parties.[7] Similarly, most states apply the statute of frauds to mortgage modifications and amendments.[8] Thus, for the Proposed Settlement to be enforceable in most states, the proposed mortgage amendments must be in writing and signed by both parties.

The statute of frauds ensures that there is clarity about the ownership and indebtedness of a key component of our economy: private property.  But the Proposed Settlement, with unwritten amendments to over 650,000 mortgages, will result in mass confusion, especially if PHH ever transfers the mortgage servicing rights. Although PHH may be the borrowers' servicer now, chances are that will change in a few years as "[s]ervicing transfers are common."[9] Mortgage servicing transfers are particularly problematic because mortgage servicers routinely fail to properly transfer loan documentation to the new servicer.[10] An unwritten, key amendment to the mortgage will substantially increase the likelihood of errors by the new servicer.

---

[6] In its December 11, 2020 "Response to Letter to the Court from Attorneys General or New York and Minnesota," (ECF Doc. 102), the Settling Parties contend that the statute of frauds argument is already before the court. However, the Settling Parties cite to ECF Doc. 67, a motion filed by Matthew Thompson on Sept. 29, 2020. Given the Court's Oct. 29, 2020 order requiring Mr. Thompson to refile his objection jointly with the other intervenors, it is unclear that the statute of frauds argument is actually before the Court. Additionally, even if it was, the Attorneys General have a special interest in ensuring that states' laws are not violated by class action settlements.

[7] Attached as Exhibit 1 to this amicus brief is a state-by-state list detailing the legal authority which provides writing requirements for mortgage contracts under state statutes of frauds.

[8] The attached Exhibit 1 also provides state legal authority regarding the application of statutes of frauds and related requirements to mortgage modifications.

[9] CFPB, Bulletin 2020-02-Compliance Bulletin and Policy Guidance: Handling of Information and Documents During Mortgage Servicing Transfers, 85 Fed. Reg. 25,281 (May 1, 2020), *available at* https://www.federalregister.gov/d/2020-09151/p-8.

[10] *See id. at* https://www.federalregister.gov/d/2020-09151/p-12 ("In supervisory examinations conducted since 2014, the Bureau has continued to find weaknesses in compliance management systems and violations of Regulation X related to mortgage servicing transfers. Specifically, the Bureau has seen inadequacies in servicers' policies and procedures for transferring all the loan information and documents to the new servicer in a timely and accurate manner.")

(Footnote Continued on Next Page)

All borrowers bear the risk of PHH committing servicer errors, not just class members, and the Proposed Settlement appears to significantly increase the risk that such errors will occur. PHH has not explained how its electronic systems will track and distinguish between those mortgages subject to the unwritten, mass amendment and those that are not. Given the abysmal servicing history of both PHH and its predecessor, Ocwen, this is a cause for concern. Ocwen has been the subject of various state regulatory enforcement actions for its deficiencies in mortgage servicing and recently settled regulatory actions with 29 states and the District of Columbia for its failure to comply with servicing laws and regulations.[11] In 2018, PHH entered into a $45 million settlement with 49 State Attorneys General and 45 state mortgage regulators for improper mortgage servicing.[12] In the past decade, New York's Department of Financial Services has entered into five consent orders or agreements with Ocwen and PHH for their servicing failures.[13] In 2017, the CFPB sued Ocwen for serious mortgage servicing errors. *See CFPB et al. v. Ocwen Financial Corp. et al.*, Ind. No. 17-cv-80495 (S.D. Fl.).[14] In its motion for partial summary judgment, filed in June 2020 (ECF Doc. 630), the CFPB alleged that:

> ". . . as shown by its own corporate records—and confirmed in discovery responses and testimony—Ocwen serviced at least hundreds of thousands of mortgage loans, in many instances for years, using inaccurate

---

[11] Ocwen Financial Corporation, 2019 Annual Report (Form 10-K) (filed Feb. 26, 2020), *available at* https://shareholders.ocwen.com/sec-filings/sec-filing/10-k/0001628280-20-002312

[12] *See* Consent Judgment, *State of Alabama et al v. PHH Mortgage Corporation*, 18-cv-00009 (D.D.C. 2018), ECF Doc. 58, available at https://tinyurl.com/yxzj2tww. Interestingly, the servicing standards from the settlement required PHH to list on its website a list of fees that it can charge. *See* Consent Judgement, Exhibit A, § VI.A.1 (available at https://tinyurl.com/yyb8qfu9). Therefore, the Proposed Settlement's requirement that PHH post its fees to its website is not new relief to the class but should have already been in effect as a result of the 2018 Consent Judgment. *See* Stip. § 5.1.3; Prel. App. Mot. at 9.

[13] *See* Consent Order to Ocwen Financial Corporation, Ocwen Loan Servicing LLC for the following dates: March 27, 2017, Dec 22, 2014, Dec. 5, 2012, and Dec, 15, 2011, available at https://www.dfs.ny.gov/industry_guidance/enforcement_actions_mortgage.

[14] The Florida Attorney General joined the CFPB's action against Ocwen but recently settled separately with Ocwen and is no longer a part of the CFPB's action. *See* Attorney General Ashley Moody Press Release, *Attorney General Moody Secures More Than $11 Million to Address Ocwen Mortgage Servicing and Foreclosure Issues* (Oct. 15, 2020), available at http://www.myfloridalegal.com/newsrel.nsf/newsreleases/78ECA4D9079FEDEC852586020048D5FC.

(Footnote Continued on Next Page)

information. Ocwen serviced many borrowers' loans using the wrong loan terms (for example, the loan's interest rate), the wrong amounts owed in principal and interest, and the wrong amounts owed for escrow."

(*Id.*, p. 1).[15]

If history is any guide, PHH will likely have difficulty in implementing an unwritten, mass amendment, and will likely charge fees to borrowers not members of the class. Without a document to point to, these borrowers will have an uphill battle in fighting any unauthorized fees.

        2.   PHH Seeks the Ratification of Fees That Violate States' Laws and Regulations

The Proposed Settlement's purported authorization of fees of $6.50 to $19.50 violates some states' prohibition against charging fees in excess of actual costs. For example, section 392.303(a)(2) of the Texas Debt Collection Act prohibits a debt collector from using unfair or unconscionable means that employ certain practices, including:

"collecting or attempting to collect interest or a charge, fee or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer."

*See* Texas Finance Code § 392.303(a)(2).

Moreover, under New York's mortgage servicing regulations, even when fees are permitted by the mortgage contract, those fees must be "reasonably related to the cost of rendering that service." 3 NYCRR § 419.5(b). Finally, there are some states where convenience fees in excess of actual costs could be a violation of the state's unfair, deceptive or abusive practices act ("UDAP"). *See e.g. Cibula v. Seterus Inc.*, No. 50-2015-CA-01090-XXXX-MB at *14 (Fla. 15th Cir. 2019) (finding plaintiffs asserted a claim under Florida's Deceptive, Unfair Trade Practices Act by stating defendant's failure to disclose that the fee charged was higher than actual costs);

---

[15]*See generally*, CFPB, *CFPB Sues Ocwen for Failing Borrowers Throughout Mortgage Servicing Process*, Press Release (April 20, 2017), avalaible at https://tinyurl.com/y3p5eq6l.
(Footnote Continued on Next Page)

*see also* CFPB, Compliance Bulletin 2017-01: Phone Pay Fees, avaliable at https://tinyurl.com/y3vpdqao.[16]

Here, Settling Parties have provided no evidence that the fees at issue are authorized or reasonably related to actual costs. Indeed, in alleging that PHH does not pass the entire fee on to the third-party processors but "retain[s] a considerable portion thereof," Plaintiffs appear to acknowledge that PHH's processing fees are in excess of actual costs. Am. Compl. ¶ 26. If that is the case, these fees are unlawful under state law, rendering the Proposed Settlement unreasonable.

3.   The Unwritten, Mass Amendments Undermine Some States' Interests in Ensuring that Mortgage Contracts and Amendments are Recorded

States and localities generally require mortgages to be recorded to ensure clarity about ownership and a property's indebtedness. States and localities also collect recording fees. Similarly, in some states, loan modifications are recorded.[17] But the Proposed Settlement's unwritten, mass amendment deprives those states of the clarity and income that comes with recording a modification. The Court should not approve a settlement that undermines some states' interests in the accurate recording of mortgage modifications.[18]

4.   The Proposed Settlement's "Safety Valve" Provision Will Force Borrowers to Sign Documents Contrary to Their Interests

Likely recognizing the illegality of an unwritten, mass amendment, the Settling Parties include a "safety valve" in the Proposed Settlement: if the unwritten, mass amendment is deemed ineffective under any state or federal statute, law or regulation, "the settlement class member

---

[16] The Attorneys General recognize that in some states, courts have rejected UDAP claims for convenience fees. *See e.g. Waddell v. U.S. Bank National Association*, 395 F.Supp.3d 676 (E.D.N.C. 2019).

[17] Shawn M. Yesner, *Loan modifications can help borrowers keep their homes,* Andrews' Bank & Lender Liab. Litig. Reo., at *1 (July 20, 2009) ("Loan Modifications typically are recorded in the county public records to provide notice to third parties that the terms of the original recorded mortgage were modified.")

[18] The Court should be aware that there is a discrepancy in what the Stipulation states is to be amended and what the proposed notice states will be amended. In the Stipulation, the Settling Parties agree that both the notes and mortgages will be amended to include language that permits convenience fees.  Stip. ¶ 5.3. In the proposed notice, it only states that the note will be amended. Stip., Ex. A, p. 2.

9

agrees to execute any and all documents as may be necessary to authorize such convenience fees under such statute, law or regulation…" Stip. § 5.3. Putting aside the issue of how such a clause could be enforced, PHH should not be permitted, through an opt-out class action settlement, to bind borrowers to affirmatively signing documents counter to their interests. If the Settling Parties need this safety valve, then this should be an *opt-in* settlement: each borrower is bound by the settlement only if he or she signs a written, individualized amended mortgage *after* being informed about the precise amount of compensation he or she will receive from the settlement.

### B. With PHH Able to Charge Excessive Fees for the Life of the Loan, the One-Time Payment to Class Members is Inadequate

The unwritten, mass amendment to the mortgage contracts enables PHH, and subsequent mortgage servicers, to charge fees in the amount of $6.50 to $19.50 per month for the remaining life of the loan. For many borrowers, this could be 20 or 30 years of monthly fees, or anywhere from $1,560 (20 years of fees at $6.50 per month) to $7,020 (30 years of fees at $19.50). In exchange, class members only receive a one-time payment that is a small percentage of the monthly fees they paid. The Attorneys General estimate the maximum any class member could receive is $166.95, assuming that PHH retained the full amount of the convenience fee[19] and before attorney fees are deducted.[20] Many class members will receive much less.

Given the amount that PHH will be permitted to charge over the life of the loan vis-à-vis what class members may get in return, the Proposed Settlement is inadequate on its face. But in addition to the paltry amount class members may receive, other facts render the Proposed

---

[19] As the intervenors note in their Opposition to Motion for Preliminary Approval of the Settlement (ECF Doc.. 94) ("Int. Opp."), the payment is not 28% or 18% of the fees actually paid. It is less. It is 28% or 18% of the amount that was pure profit to PHH. Int. Opp. at 7.

[20] This amount was reached assuming the class member paid $17.50 every month for the longest period for which relief could be given, 53 months. This subclass only receives 18% of the money retained by PHH. The resulting formula is: (17.50 x .18) x 53 = 166.95.

Settlement inadequate, including that some of the relief will go to late fees and that any unclaimed settlement money reverts to PHH.

1. <u>Some of the Class Members' Awards Will Go to Late Fees</u>

Another example of the settlement's benefit to PHH, at class members' expense, is that settlement credit is applied to late fees first. Prel. App. Mot. at 8. Class members whose loans are still serviced by PHH – which is approximately 80% of the class – will not receive a check. Instead, their mortgage accounts will be credited the amount of their awards, with late fees being paid before any credit is applied to the unpaid principal balance. *Id*. While late fees are permissible under most mortgage contracts and become a debt the borrower owes, paying this debt before paying down the principal is less beneficial for borrowers. Additionally, unlike payments to principal, which are made to the owner of the mortgage, late fee payments are solely an income stream for servicers.[21] This is why in many government loan modification programs, servicers are required to waive all late fees.[22]

Again, because of the speed of the settlement and the lack of any meaningful discovery, the Court and the Attorneys General are left in the dark regarding how much of the settlement will be applied to PHH's late fees, which is essentially a payment to itself, not to class members. The more the settlement fund goes to late fees, the more inadequate the Proposed Settlement becomes.

2. <u>Requiring Former PHH Class Members to File Claim Forms Will Result in Fewer Payments to Borrowers</u>

---

[21] Nat'l Consumer Law Center, *Why Services Foreclose When They Should Modify and Other Puzzles of Servicer Behavior: Servicer Compensation and Its Consequences*, p. 17 (Oct. 2009) ("Most PSAs permit servicers to retain fees charged to delinquent homeowners. . . . Examples of these fees include late fees. . . ")

[22] The Home Affordable Modification Program ("HAMP"), the federal government's voluntary modification program which was in existence from 2009 to 2016, required servicers to waive all late fees when offering a modification.  See HAMP Handbook for Servicers of Non-GSE Mortgages, v.5.1 §§ 6.3.1.1., 9.3.2 (May 26, 2020) (prohibiting capitalization of late fees and requiring waiver of late fees and similar charges upon the borrower receiving a permanent modification).  In addition, HUD, through its Federal Home Administration ("FHA") modification program known as FHA-HAMP, requires servicers to forgive all late fees when modifying the loan. See HUD Mortgagee Letter 2008-21 (Aug. 14, 2008) (FHA Loss Mitigation Program Update).

By requiring Former PHH Borrowers to submit a claim form, less money will be distributed to class members. The Settling Parties argue that a claim form is necessary because in *McWhorter v. Ocwen Loan Servicing, LLC*, 2019 WL 9171207 (N.D. Ala. Aug. 1, 2019), where checks were automatically issued and no claim form was required, nearly 50% of those checks went uncashed. *Id.* However, according to the Federal Trade Commission ("FTC"), when a claim form is involved, only 9% of class members return the form.[23] Thus, if PHH requires a claim form, likely only 9% of Former PHH Borrowers will return the form.[24] Here, the class consists of 943,706 members, with 20% of the class – or 188,741 individuals – Former PHH Borrowers. A 50% check-cashing rate – without a claim form – would mean 94,370 Former PHH Borrowers would receive monetary compensation. If the Settling Parties are permitted to institute a claim form roadblock, and assuming a 9% return rate, only 16,987 Former PHH Borrowers would receive compensation.[25]

Checks can – and should – be mailed directly to the borrowers' current address without a claim form.  Presumably, many of the Former PHH Borrowers within the class live in the home subject to the mortgage. But in case they do not, PHH can confirm the current address with the new servicer. While this may take more effort on PHH's part, it will ensure that more Former PHH Borrowers receive their monetary award.

      3.   <u>Former PHH Borrowers Are Bound by the Proposed Settlement Even If They Do Not Submit a Claim</u>

Under the Proposed Settlement, Former PHH Borrowers who do not file a claim form, and thus do not receive compensation, are still bound by the Proposed Settlement's terms. Stip. §

---

[23] FTC, Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns, p. 1 (Sept. 2019), avaliable at https://tinyurl.com/y5k5h6zt.
[24] *Id.*
[25] Settling Parties hide numbers essential to evaluating the adequacy, fairness and reasonableness of the proposed settlement. The Settling Parties only provide that 20% of class members will receive a check. The more important number though is how many mortgages are tied to that 20% figure (because class members who are co-borrowers will likely only receive one check). Because we do not have that number, the Attorneys General can only give an estimate.  But even with that number, the disparity between a 50% return rate and 9% return rate will be stark.

4.7.3.2. Similarly, failure of Former PHH Borrowers to cash the check will also constitute a release of their claims. Stip. § 4.9. It is inherently unfair to bind individuals to a radical change in their mortgage contract if they do not receive compensation or notice of the change.

        4.  <u>Providing for Unclaimed Settlement Funds to Revert to PHH Is Unfair and Unreasonable</u>

Another inadequacy of the Proposed Settlement is that unclaimed settlement funds revert to PHH, a provision that is not beneficial to class members and is disfavored in consumer class actions. *Poertner v. Gillette Co*., 618 F. App'x 624, 630 n.6 (11th Cir. 2015) (noting that reverter provisions are "potentially problematic because they deprive the class of benefits that the defendant is willing to pay."); *Zamber v. American Airlines, Inc*., 2019 WL 2262914, *20 n. 5(S.D. Fl. 2019) (noting that "clear-sailing" or "kicker" clauses, while not outright prohibited, "might be a subtle sign that the class is not getting as good a deal. . . .").

The amount of the $12.6 million settlement fund that will revert to PHH could be substantial since Former PHH Borrowers, who must file a claim form to receive a check, constitute 20% of the class. Stip. § 4.7.3.2. As demonstrated above, only a small percentage of class members can be expected to file a claim form, resulting in even more money to revert back to PHH. It is also important to note that the amount that could revert to PHH might well exceed 20% of the $12.6 million. Depending on the amount paid in fees by the Former PHH Borrowers – information not disclosed by the Settling Parties – it is possible that a disproportionate amount of the $12.6 million settlement fund will go to the Former PHH Borrowers, resulting in a much larger reverter to PHH than the Settling Parties are currently disclosing.

        5.  <u>PHH's Claim That it Would Not Permit These Forms of Payments Without Fees is Suspect</u>

PHH states that, if unable to charge fees, it would not provide its borrowers phone-based and online payment services. Joint Response to Intervenors' Opposition to Motion for Preliminary Approval ("Joint Response") (ECF Doc. 97) at11.  But its own actions prove otherwise.  In states that prohibit such fees, PHH continues to offer, free of charge, payment by phone and online.  *Id*. Indeed, it's in PHH's interest to facilitate borrowers' payments and avoid delinquencies.

> 6. <u>For the Court to Determine Adequacy, PHH Should Reveal the Range of Payments and the Average Payment for Class Members</u>

The Proposed Settlement cannot be found adequate because the Settling Parties have failed to provide information regarding the actual amounts class members will receive. In addressing the adequacy of the settlement amount, the Settling Parties deal only in percentages.  Thus, they state that 80% of the class members will receive 28% of the portion of the convenience fee that was PHH's profit and 20% of the class members will receive 18% of the portion of the convenience fee that was PHH's profit.  In fact, because a *pro rata* amount will be deducted for attorney fees, the total amount received by class members will be even less than these percentages. The actual amount that class members will receive is necessary to assess the adequacy of this amount vis-à-vis the mortgage amendments that authorize excessive fees for the life of the loan held by class members. The use of percentages also hides the potential amount that will revert back to PHH for Former Borrowers who do not submit claim forms. The Settling Parties have this information. The Proposed Settlement cannot – and should not – be approved without a review of actual numbers.

### C.  The Proposed Settlement Fails to Treat Class Members Equitably

That the Proposed Settlement treats Former PHH Borrowers better than Current PHH Borrowers is unfair and a clear violation of Rule 23 which requires equitable treatment among class members. Additionally, the Proposed Settlement is unfair because low- and middle-income borrowers unnecessarily bear the cost of PHH's fees.

1.  <u>The Proposed Settlement Treats Current PHH Borrowers Less Favorably than Former PHH Class Members</u>

The Proposed Settlement fails to treat all class members equally, a factor courts must consider under the 2018 Amendments to Rule 23. F.R.C.P. 23(e)(2)(D) (courts can only approve a settlement after considering whether "the proposal treats class members equitably relative to each other"). Here, there are clear distinctions between two types of class members– Current PHH Borrowers and Former PHH Borrowers. Current PHH Borrowers are disadvantaged by the Proposed Settlement. As stated above, Current PHH Borrowers do not receive a check. Instead, their account will be credited, with late fees being paid before any principal is paid. But Former PHH Borrowers, at least those who return the claim form (*see* Part I.B.2, *supra*), will receive a check, providing them with the benefit of the present value of money. This check, which the Former PHH Borrower can use as he or she sees fit, is significantly better than the credit to late fees received by a Current PHH Borrower.

In addition, the injunctive relief disadvantages Current PHH Borrowers. The Proposed Settlement would effectively amend the mortgage agreements of borrowers whose loans are currently serviced by PHH and permit PHH to charge those borrowers thousands of dollars of fees over the remaining life of the loan. *See* Joint Response at 13.[26] As a result, Former PHH Borrowers, whose mortgages have been transferred to another servicer, may not be subject to the additional, likely illegal fees, imposed by PHH for servicing the mortgage. *Id*. Similarly, under the Proposed Settlement, Former PHH Borrowers do not have to give up their breach of contract, FDCPA or

---

[26] The Intervenors dispute the Settling Parties' assertion that Former PHH Borrowers' mortgage contracts will not be amended. The Attorneys General agree with the Intervenors that the Proposed Settlement appears to require unwritten, mass amendments to both Current and Former PHH Borrowers. But for purposes of analyzing the equity between different class members, the Attorneys General will assume that the Settling Parties are correct.

UDAP claims to obtain a payment. But Current PHH Borrowers do. Because of inequitable treatment, the Court must reject the Proposed Settlement.

2.   The Proposed Settlement Penalizes Low- and Moderate-Income Consumers

PHH does not charge fees when the borrower mails in a check or where a borrower sets up an automatic debit from his or her bank account. Stip. at 8. But there are costs associated with both of these payment methods. Where payment is made by check, an employee must open the envelope, record the receipt of the check in the PHH system and the check must be deposited. Establishing and maintaining the technology behind automatic debits also have a cost.[27] These two forms of payment are usually used by borrowers with enough of a cushion in their bank accounts that they do not need to worry about a bounced check or insufficient funds.

PHH only charges fees to borrowers who need the extra time to make their monthly mortgage payments. *See* Prel. App. Mot at 10 (noting that these payment methods "may help late-paying borrowers"). These are likely borrowers who live paycheck-to-paycheck, do not have a cushion in their bank accounts, and need the extra time afforded by the payment grace period[28] to collect the monthly mortgage payment.[29] The Attorneys General are concerned about our states' low- and moderate-income borrowers being asked to compensate PHH for services that high-income borrowers are given for free. Such differential treatment is unfair and grounds for rejecting the Proposed Settlement.

II.  **THE CASES RELIED ON BY THE SETTLING PARTIES, INCLUDING IN PARTICULAR, THE** *MCWHORTER* **SETTLEMENT, DO NOT JUSTIFY THE PROPOSED CLASS ACTION SETTLEMENT HERE**

---

[27] Presumably, the technology used for automatic debits is the same or similar to the technology used when the borrower makes a payment online through his or her account. The latter comes with a $7.50 fee, but the former comes with no fee.

[28] The FHA and GSE uniform Note and Security Instruments provide a 15-day grace period before charging late fees.

[29] To the extent the Settling Parties contest this assertion, PHH should provide this data to the Court. PHH has the origination files for class members which include homeowners' income at the time they applied for the loan.

The Settling Parties cite to a string of cases to argue that unwritten, mass amendments of contracts are common. *See* Joint Response, p. 12-13. But only two of those cases, *McWhorter* and *In re Salem Mortg. Co*., 783. F.2d 626 (6th Cir. 1986), involved mortgages and the issue of whether a state's particular statute of frauds requires a mortgage modification to be in writing. In *In re Salem*, the Sixth Circuit fails to state whether the mass amendments – which significantly benefited the property owners by decreasing the interest rates and eliminating unlawful fees – were unwritten and not recorded. While *McWhorter* did permit an unwritten, mass amendment, there are substantial differences between the *McWhorter* settlement and the Proposed Settlement. As a result, the Settling Parties' extensive reliance on *McWhorter* in an effort to convince the Court to accept the Proposed Settlement is misplaced. *See* Prelim. App. Mot. at 4.

### A. Notice to the Attorneys General of the Settlement in *McWhorter*, Provided Pursuant to CAFA, Does Not Amount to State Approval of that Settlement.

The Settling Parties make much of the fact that the Attorneys General received notice of the settlement in *McWhorter* and did not object to that settlement.  However, a party's compliance with CAFA's notification requirements does not amount to an approval of a settlement by the federal or state officials who receive the notification. CAFA makes clear that the notice of a settlement provided in one particular case does not bar federal or state officials from challenging class action settlement terms proposed in a different case. 28 U.S.C. § 1715(f) ("Nothing in this section shall be construed to…impose any obligations, duties, or responsibilities upon, Federal or State officials."). CAFA's legislative history reiterates the optional nature of the Attorneys General's participation.  S. REP. NO. 109-14, at 33 (2005) ("Thus, federal and state officials will be notified about proposed settlement and have an opportunity to get involved if they think it is appropriate but will not be required to do so.")

In contrast, *Amici* States are fulfilling their role here to "provide a check against inequitable settlements" by raising significant concerns to the attention of the Court. *Id*. at 35. The fact that the Attorneys General did not file an opposition in *McWhorter* has no legal bearing on the reasonableness, adequacy or fairness of the Proposed Settlement in this case.

**B. No State Approved of The *McWhorter* Settlement and the Settling Parties Misrepresent the Communications with State Regulators in *McWhorter***

The Settling Parties do not accurately present the communications between the State Attorneys General and defense counsel in the *McWhorter* case, the same defense counsel in this case, Michael R. Pennington of Bradley Arant Boult Cummings LLP, and by doing so, they incorrectly imply that the Attorneys General approved the *McWhorter* settlement. *See e.g.* Joint Response at 9 (Intervenors "now ask this Court to allow their views to preempt those of every other Settlement Class Members and government regulator."); Prel. App. Mot. at 2 (the *McWhorter* settlement "was considered by all of the relevant state and federal mortgage regulators who carefully reviewed the proposed terms of the Stipulation of Settlement and Release sent to them…"); *Id*. at 5 ("[O]n Eleventh Circuit law, the court granted final approval of the *McWhorter* settlement, without the objection from any federal or state regulator."); Transcript of October 29, 2020 Hearing, at 32:11-17 (Plaintiffs' counsel stating that "[n]ot one regulator objected to the note amendment… but what about the actual regulators that got the notice? They didn't say a word.").

Rather, the Attorneys General believed the proposed *McWhorter* settlement to be problematic. Contrary to the Settling Parties' suggestion, the Attorneys General did not implicitly approve of any aspect of the *McWhorter* settlement, and made that clear in communications with Mr. Pennington. On July 19, 2018 a group of State Attorneys General emailed Mr. Pennington to inquire about certain aspects of the proposed *McWhorter* settlement. *See* Declaration of Sarah Petrie ("Petrie Decl."), Ex. 2. The email stated that the Attorneys General's "discussion, or any

subsequent inaction by the States may not be presumed to be, construed, or interpreted as an affirmative approval of, support for, or objection to the terms of the settlement. Any representation or implication to the contrary would be deceptive." *Id.*, Ex. 2, p. 5. Yet, despite such clear language, Settling Parties, as shown above, continue to present to this Court that the state regulators' decision not to formally bring concerns to the *McWhorter* Court is of significance.  It is not and, as Mr. Pennington was expressly warned, to imply otherwise is deceptive.

Two subsequent inquiries about the settlement were emailed to Mr. Pennington, on August 14, 2018 and on September 10, 2018, but they went unanswered. *Id.*, Ex. 3. Mr. Pennington did respond to a third inquiry, sent by the Attorneys General nearly a year later, on June 17, 2019, which requested a loan-by-loan audit of the amount of processing fees charged to borrowers. *Id.* Ex. 2, pp.1-2. Mr. Pennington essentially rejected the Attorneys General's request and stated that "loan-by-loan amounts were not necessary to determining whether the $9.7 million aggregate settlement amount was fair and reasonable…." *Id.*

At no point during communications with Mr. Pennington did the Attorneys General indicate that they approved or were in support of the *McWhorter* settlement. In fact, the Attorneys General specifically instructed Mr. Pennington not to draw such inferences. The Court should reject the Settling Parties' reliance on *McWhorter* and any attempts to suggest that State Attorneys General approved of that settlement.

### C.  Differences from the *McWhorter* Settlement Demonstrate Why the Proposed Settlement Terms Require Further Scrutiny

The Settling Parties have stated that the Proposed Settlement "is structured on same [sic.] overall framework as the *McWhorter* settlement." Prel. App. Mot. at 2. The Settling Parties further allege that the settlement reached in this case "is far superior to the approved *McWhorter* settlement as it is much greater in total amount, compensates greater amount of class members

over a longer class period, provides enhanced injunctive relief, and seeks a lower percentage of

attorneys' fees and smaller class representative awards from the fund." *Id*. at 7. However, when

compared to *McWhorter*, the Proposed Settlement is far worse for class members in the following

ways:

- **The Proposed Settlement provides considerably less monetary relief to class members**. The *McWhorter* settlement fund was for $9.7 million for of 250,194 individuals with 183,832 loans. *McWhorter*, ECF Doc. 49, pp. 8 & 9, providing an average payment of $39 (before cost and fees). The Proposed Settlement has a $12.6 million settlement fund for 943,706 class members with 659,304 loans, Prel. App. Mot. at 16-17, providing an average payment of $13;[30]

- **The Proposed Settlement allows for the unclaimed settlement funds to revert to PHH**, *see* Stip., § 4.10. The *McWhorter* settlement did not contain a reverter and instead provided for a *cy pres* award of unclaimed funds to Homes for Our Troops, a nonprofit organization. *McWhorter*, ECF Doc. 49-1, § 4.7;

- **The Proposed Settlement requires Former PHH Borrowers to file a claim form**. Stip. § 4.7.3.2. *See* Part I.B.2, *supra*;

- **The Proposed Settlement binds Former PHH Borrowers even if they do not file a claim form or they fail to cash their checks**. Stip. §§ 4.7.3.2 & 4.9. *See* Part I.B.3, *supra*;

- **The Proposed Settlement contains a "safety valve" if the unwritten, mass amendment is deemed illegal.** Stip. § 5.3. *See* Part I.A.4, *supra*.

## CONCLUSION

For the reasons set forth above, the Attorneys General respectfully request that the Court

reject the Proposed Settlement because it is not fair, reasonable or adequate.

---

[30] Again, as noted throughout this brief, the actual amount each class member will receive is less than what we estimate given the deductions for attorney fees and the fact that the calculation is not based on what each class member paid in convenience fees but rather the profit PHH retained from that payment.

Dated:  January 28, 2021

LETITIA JAMES
Attorney General
State of New York


_/s/Elizabeth M. Lynch_
ELIZABETH M. LYNCH
Assistant Attorney General
NY Atty. Reg. No. 4229399
(*admitted in the S.D.Fl via pro hac vice, ECF Doc. 16*)
Bureau of Consumer Frauds and Protection
28 Liberty Street
New York, NY 10005
(212) 416-6314
elizabethm.lynch@ag.ny.gov

*ATTORNEY FOR*
*STATE OF NEW YORK*


CLYDE "ED" SNIFFEN, JR.
*Acting Attorney General of Alaska*
1031 West 4th Avenue, Suite 200
Anchorage, AK 95501

MARK BRNOVICH
*Attorney General of Arizona*
2005 N. Central Ave.
Phoenix, AZ 85004-1592

XAVIER BECERRA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

Dated:  January 28, 2021

KEITH ELLISON
Attorney General
State of Minnesota


_/s/Mawerdi Hamid_
MAWERDI HAMID
Assistant Attorney General
MN Atty. Reg. No. 0393130
(*admitted in the S.D.Fl via pro hac vice, ECF Doc. 107*)
445 Minnesota Street
Suite 1400
St. Paul, Minnesota 55101-2131
(651) 728-7096
mawerdi.hamid@ag.state.mn.us

*ATTORNEY FOR*
*STATE OF MINNESOTA*


DANA NESSEL
*Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

DOUGLAS J. PETERSON
*Attorney General of Nebraska*
2115 State Capitol
Lincoln, NE 68509

AARON D. FORD
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

JANE E. YOUNG
*Deputy Attorney General of New Hampshire*
33 Capitol Street
Concord, NH 03301

21

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
820 N. French Street
Wilmington, DE 19801

KARL A. RACINE
*Attorney General for District of Columbia*
400 6th Street NW
Washington, DC 20001

ASHLEY MOODY
*Attorney General of Florida*
3507 E. Frontage Road, Suite 325
Tampa, FL 33607

CLARE E. CONNORS
*Attorney General of Hawaii*
425 Queen Street
Honolulu, HI 96813

LAWRENCE WASDEN
*Attorney General of Idaho*
P.O. Box 83720
Boise, ID 83720-0010

KWAME RAOUL
*Attorney General of Illinois*
100 W. Randolph, 12th Floor
Chicago, IL 60601

THEODORE E. ROKITA
*Attorney General of Indiana*
200 West Washington Street, Room 219
Indianapolis, IN 46204

TOM MILLER
*Attorney General of Iowa*
1305 E. Walnut St.
Des Moines, IA 50319

HECTOR H. BALDERAS
*Attorney General of New Mexico*
201 Third St. NW, Suite 300
Albuquerque, NM 87102

JOSH STEIN
*Attorney General of North Carolina*
P.O. Box 629
Raleigh, NC 27602

DAVE YOST
*Attorney General of Ohio*
30 E. Broad St., 14th Floor
Columbus, OH 43215

MIKE HUNTER
*Attorney General of Oklahoma*
313 N.E. 21st Street
Oklahoma City, OK 73105

ELLEN F. ROSENBLUM
*Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

JOSH SHAPIRO
*Attorney General of Pennsylvania*
16th Floor, Strawberry Square
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

MARK R. HERRING
*Attorney General of Virginia*
202 North 9th Street
Richmond, VA 23219

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

MAURA HEALEY
*Attorney General of Massachusetts*
One Ashburton Place
Boston, MA 02108

ROBERT FERGUSON
*Attorney General of Washington*
800 Fifth Ave., Suite 2000
Seattle, WA 98104

PATRICK MORRISEY
*Attorney General of West Virginia*
State Capitol, Bldg. 1, Room E-26
Charleston, WV 25305