```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          (FT. LAUDERDALE)
                           CASE NO.  20-CV-60633
 3

 4

 5   VINCENT J. MORRIS,
     on behalf of themselves
 6   and all others similarly
     situated,
 7            Plaintiffs,                  Ft. Lauderdale, Florida
     vs.                                   March 23, 2021
 8
     PHH MORTGAGE CORPORATION,    Tuesday Morning Session
 9   et al.,
              Defendants.                   Pages 1-61
10   ------------------------------------------------------------
                            Telephonic Hearing
11               BEFORE THE HONORABLE RODNEY SMITH
                    UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13   Via AT & T:

14   FOR THE PLAINTIFFS:  The Moskowitz Law Firm, by:
                          ADAM M. MOSKOWITZ, Esq.,
15                        HOWARD M. BUSHMAN, Esq.,
                          2 Alahambra Plaza, Suite 601
16                        Coral Gables, Florida  33134

17   FOR THE INTERVENORS: Berger, Singerman, by:
                          MICHAEL JEROME HIGER, Esq.,
18                        1450 Brickell Avenue, Suite 1000
                          Miami, Florida  33131
19
                          Carney, Bates & Pulliam, by:
20                        EDWIN LEE LOWTHER, III, Esq.,
                          RANDALL K. PULLIAM, Esq.
21                        519 W. 7th Street
                          Little Rock, Arkansas  72201
22
                          Bailey & Glasser, LLP, by:
23                        JAMES LAWRENCE KAUFFMAN, Esq.
                          1055 Thomas Jefferson Street, NW
24                        Suite 540
                          Washington, DC  20007
25
```

```
 1    APPEARANCES CONTINUED:

 2

 3    FOR THE DEFENDANTS: Bradley, Arant, Boult, Cummings, by:
                          MICHAEL R. PENNINGTON, Esq.
 4                        1819 5th Avenue North
                          One Federal Place
 5                        Birmingham, Alabama  35203

 6

 7    FOR THE STATE OF NEW YORK:

 8                        New York Attorney Generals Office, by:
                          ELIZABETH LYNCH, Esq.
 9                        Bureau of Consumer Frauds and Protection
                          28 Liberty Street
10                        New York, NY  10005

11    FOR THE STATE OF MINNESOTA:

12                        Minnesota Attorney Generals Office, by:
                          MAWERDI HAMID, Esq.
13                        445 Minnesota Street, Suite 1400
                          Saint Paul, MN  55101
14

15    FOR THE UNITED STATES:    U.S. Department of Justice
                                Consumer Protection Branch, by:
16                              DAVID H. HIXSON, Esq.
                                PO Box 386
17                              Washington, DC  20044

18

19

20

21    STENOGRAPHICALLY
      REPORTED BY:        ELLEN A. RASSIE, RMR-CRR
22                        Official Court Reporter to the
                          Honorable Rodney Smith
23                        299 East Broward Blvd., Room 202A
                          Ft. Lauderdale, Florida  33301
24

25
```

1     **<u>TUESDAY MORNING SESSION, MARCH 23, 2021</u>**

2              <u>P-R-O-C-E-E-D-I-N-G-S</u>

3                      - - -

4              (Call to the Order of the Court.)

5          THE COURTROOM DEPUTY:  Good morning, Judge.  My name

6     is Ricky.  I'm covering for Patricia this morning from Miami.

7     I have the court reporter on, I have a bunch of attorneys.  I

8     don't know if all of them are on the line, Judge, but I have a

9     lot of the attorneys on the line as we speak?

10         THE COURT:  All right.  With that said, you want to

11    call the case, Ricky?

12         THE COURTROOM DEPUTY:  Yes, Judge.  The Court is now

13    in session, Honorable Judge Smith presiding.  Case number is

14    20-60633, Vincent Morris versus PHH Mortgage Corporation.

15    Counsel, please state your appearances, starting with

16    plaintiff.

17         MR. PENNINGTON:  This is Michael Pennington appearing

18    for the defendants.

19         MR. MOSKOWITZ:  This is Adam Moskowitz on behalf of

20    the plaintiffs.

21         MR. BUSHMAN:  And Howard Bushman on behalf of the

22    plaintiffs.

23         MR. HIGER:  Good morning, Your Honor.  On behalf of

24    the Intervenors, this is Michael Higer who's serving as local

25    counsel.  Also as counsel for the Intervenors is Darren

```
 1   Newhart, Randy Pulliam, Lee Lowther and James Kauffman, all on

 2   behalf of the Intervenors, Stephanie Hendricks, Anita Barrow,

 3   Tammy Woolbright and Matthew Thompson.

 4          And with Your Honor's permission, Mr. Kauffman of the

 5   Bailey Glasser firm will address the Court on behalf of all the

 6   Intervenors collectively.

 7          THE COURT:  All right.  That's fine.  Anyone else?

 8          MR. PENNINGTON:  Your Honor, Michael Pennington

 9   again.  Also on the line with me -- I'll be doing the arguing

10   for the defendants, but on the line with me are my partners,

11   Zac Madonia, senior vice president and deputy general counsel

12   for the defendants, Eric Spett, and vice president and

13   assistant general counsel for the defendants, Jason Risk.

14          THE COURT:  Thank you.  Anyone else?

15          MS. LYNCH:  For the Coalition of State AGs Amicus,

16   this is Elizabeth Lynch from the New York State Attorney

17   General's Office and also appearing with me is Mawerdi Hamid

18   from the Minnesota Attorney General's Office.  I will be doing

19   the speaking today.

20          THE COURT:  You say the last name is Lynch?

21          MS. LYNCH:  Lynch, L-Y-N-C-H.

22          THE COURT:  Got it.  Thank you.

23          MS. LYNCH:  Thank you.

24          THE COURT:  Anyone else?

25          MR. HIXSON:  Good morning.  David Hixson on behalf of
```

1    the United States.

2              THE COURT:  Good morning.

3              MR. HIXSON:  Good morning.

4              THE COURT:  All right.  That covers everyone?  All

5    right.  With that said, we're ready to proceed.

6              Mr. Moskowitz?

7              MR. MOSKOWITZ:  Thank you.  Thank you very much, Your

8    Honor.  Did Your Honor get a copy of the exhibits that we

9    submitted to the Court last Thursday?

10             THE COURT:  Yes.  Also for the record, the Court did

11   review all submissions that have been filed.  I do have all the

12   exhibits, and I did read them.

13             MR. MOSKOWITZ:  Okay.  Thank you so much, Your Honor.

14   Then I'll be very brief before I turn it over to

15   Mr. Pennington.

16             The past seven months have certainly been an extremely

17   unique situation for many class actions that I've been involved

18   in in 27 years.  There's been a tremendous amount of opposition

19   from competing lawyers who are on the phone call, the AGs and

20   the DOJ, but, Your Honor, as we point out in our slide, there's

21   really no analysis as to the real world what is in the best

22   interests of the class members at all.

23             There's really no discussion as to the risks in these

24   cases, and it couldn't be more clearer, such a unique set of

25   facts where you have many courts which are dismissing these

```
 1   exact claims among our cases that we are bringing are being
 2   dismissed by judges in our courts.
 3        Judge Moore recently dismissed the claim, Intervenors
 4   own first case that they brought against OCWEN.  That was
 5   dismissed with prejudice.
 6        And then also you have people like Judge Altonaga
 7   who's saying I can't certify a contested litigation class for
 8   these exact class members.  There's no way to do it.  And
 9   there's other courts that are granting motions for summary
10   judgment against plaintiffs for the same claims and they've
11   actually granted motions for summary judgment against the
12   Intervenors for these same causes.
13        So, with all of these unique facts, Your Honor, it's
14   just unconscionable how we can think that the class themselves
15   do not get an ability to even be heard.
16        And it's pretty shocking because the DOJ and the
17   Attorney General are not allowed to file objections.  They have
18   no standing to object.  They can just file their statement of
19   interest.  They can give their thoughts on what they think.
20   But how could that possibly mean that the DOJ comes into that,
21   that the Court allows them to file a statement of facts that
22   somehow that would preclude any of the one million class
23   members who we've spoken to, that we've already been doing the
24   Lender Place Insurance cases for ten years.  We represented a
25   large portion of these class members.  We've spoken to them.
```

1              They're not able to give their opinion as to the

2      proposed settlement because the Department of Justice or the

3      AGs come in and some competing lawyers come in and say we don't

4      like the deal, and that's just, to us, seems unconscionable

5      because the Eleventh Circuit, as we state, requires for any

6      preliminary approval to be within the range of reasonableness,

7      and then for the Court to grant final approval, you look to the

8      reaction of the class.

9              So, how could you look to the reaction of the class if

10     you have a competing law firm with their own interests and then

11     the DOJ and the Attorney General who could certainly bring

12     their own case, and they have with the consent decree that we

13     filed, and I think it must have been surprising to them to not

14     realize that their servicing guidelines as a result of the

15     consent decree, you know, specifically talk about these charges

16     and say if PHH and OCWEN do A, B and C, those are okay.

17             And there's cases that we have, Your Honor, now,

18     pending against other servicers who have raised these consent

19     decrees as a defense.  They were allowed to charge these

20     charges.  See the consent decrees that have been entered by the

21     Government, so it's unbelievable to us that this is a great

22     settlement.  This isn't a good settlement.  This is a great

23     settlement.

24             It provides almost 28 percent fees back.  It lowers

25     the fees for three years.  It freezes charges, and then note

1   amendment, what we started with is the only authority out there

2   in the country with a Federal judge in the McWhorter case, she

3   found that the note amendment was a great benefit for class

4   members.

5        The quote in the slide is it preserves settlement

6   members' ability to make payments via more rapid expeditious

7   methods.  It sets maximum prices and it ends any uncertainty as

8   to whether the fees are legally authorized.

9        So, you have the McWhorter judge saying I think the

10  note amendment is a great idea.  When we were settling these

11  cases, as we say in our papers, the Intervenors joined us in

12  the mediation before Rodney Max, a nationally renowned mediator

13  who's done the McWhorter case and many other cases and was

14  picked by the Investors, so there's no collusion because

15  everything was at arm's length before Rodney Max.

16       But when we were starting the settlement, we said how

17  else could a defendant get assurances that there will be

18  release from each of the class members?  How else could you do

19  this settlement?  We could not think of any other way in which

20  to guarantee the defendants peace.  We asked the Intervenors,

21  they couldn't come up with anything.

22       We talked to experts.  You heard from Bernie Bernbaum.

23  They couldn't come up with anything.  The only resolution was a

24  note amendment which we thought was helpful to the class.  So,

25  that's why it seems to us so shocking that somehow, this

1    settlement doesn't fall within the range of reasonableness when

2    many of the judges are dismissing these exact same claims,

3    courts are denying certification.  They're granting summary

4    judgment.

5            So, it's a very, very, very difficult case to ever

6    bring to trial, to ever get certified, to ever beat summary

7    judgment, to defeat all the appeals and here you're getting

8    millions and millions of dollars to our class members, and all

9    they've got to do is there's this note amendment that tells

10   them if they want to use this service, they're going to be

11   charged.

12           And the reason it's shocking to us is because they can

13   opt out of the settlement.  That's the great thing about opt

14   out.  If they don't like the settlement for themselves, they

15   can just opt out and they're not bound by the note amendment.

16           So, you have one million class members that are out

17   there, and somehow, the DOJ and the Attorney Generals who could

18   bring their own cases, who have brought their own cases before,

19   can somehow usurp the ability of class counsel to look out for

20   the class.  It's just unconscionable, and it's a dangerous

21   precedent to set because you always want to hear from the

22   class.  That's what the Eleventh Circuit said is one of the

23   most important of the seven factors.

24           So, we would respectfully ask that Your Honor allow

25   the notice to go out, allow the class to be heard, and then we

1   could have the final fairness hearing and go through the six

2   factors that the Leverso Court in the Eleventh Circuit said is

3   necessary which includes what are the risks that the plaintiffs

4   seek here?

5          And it's just shocking to me that the DOJ and the

6   Attorney Generals could come in, but not talk about the risks,

7   not about them bringing their own claims against OCWEN and PHH

8   and they've certainly had litigation against PHH and OCWEN for

9   many years.  That's not part of this case, but what is the

10  risks to these class members of bringing their own individual

11  claims against OCWEN and PHH for these fees that most courts

12  now are finding are legal?

13         So, it's just shocking to us when we have all of our

14  other cases pending before this Court that are having problems

15  so we reached a great settlement, but somehow a competing law

16  firm that has their own interests in advancing their own case

17  and then the Attorneys General and the DOJ that can't even file

18  objections could somehow defeat the class ever being heard.

19         So, we would respectfully request, Your Honor, that

20  you just find that it falls within the range of reasonableness,

21  let's hear the reaction from the class, and then we're very

22  optimistic that the Court will grant final approval when that

23  day comes.  Thank you very much, Your Honor, and I'm open to

24  answer any questions Your Honor may have.

25         THE COURT:  Yes, I have a few questions before we

1   move forward.  What is the amount paid to the third party

2   vendor and how will it affect the class member recovery?

3         MR. MOSKOWITZ:  I can let Mr. Pennington give more

4   details on that in terms of the specifics of the OCWEN/PHH

5   program.

6         MR. PENNINGTON:  Your Honor, the third party costs,

7   and there are other costs, internal costs, but the third party

8   costs varied slightly from month to month based on volume, but

9   within the range of 25 cents to 40 cents -- I'm sorry, 25 cents

10  to 50 cents depending on the volume in any given month.

11        That -- that is generally a company that used to be

12  involved with -- used to be part of Western Union.  If a class

13  member went to Western Union and got the same services directly

14  from Western Union, it would cost much more, on the order of

15  $15 to $20, or more.  It's generally a percentage of the

16  payment.

17        THE COURT:  Well, could you give me the extra amount?

18  What number, for example, was paid?

19        MR. PENNINGTON:  I'm sorry, I'm not understanding.

20        THE COURT:  You said 25 cents or 50 cents.  Like, for

21  example, how much money, do we have the numbers what they

22  receive for a month, a given month?

23        MR. PENNINGTON:  Your Honor, we have not totaled up

24  the total payments made to third party vendors in any given

25  month at this point.  Each payment under the settlement that a

```
 1  borrower made would be refunded based upon the actual amount

 2  paid to the third party vendor for that payment.

 3          And since it varies, it's between 25 and 50 cents in

 4  terms of third party costs.  There's not a set number that we

 5  can specify, you know, for each and every class member without

 6  having a table a mile long.  But the numbers are there, and the

 7  numbers are easily determined and will be paid.

 8          THE COURT:  You're still not getting what I'm asking,

 9  but I'll move forward to my next question.

10          MR. PENNINGTON:  I can certainly --

11          THE COURT:  How much did PHH collect from the class

12  in receipts per year?

13          MR. PENNINGTON:  How much do we collect in fees?

14          THE COURT:  Yes.  How much does PHH collect from the

15  class in fees per year?

16          MR. PENNINGTON:  Your Honor, that also has varied

17  widely.  Here, we have a four-year period.  Somewhere in the

18  range of, I believe, it's from the entire class.  Somewhere in

19  the range of ten to $15 million, I believe, total in fees on

20  average.

21          THE COURT:  And do you know how much PHH collects

22  during the class period?

23          MR. PENNINGTON:  We do know how much OCWEN and PHH

24  collected during the class period in total fees.  I think the

25  total amount is 70 to 80 million dollars over the total period.
```

```
 1    I don't have the exact number in front of me, but it's in that
 2    range.
 3              THE COURT:  You don't know what amount was paid to
 4    the third party vendor?
 5              MR. PENNINGTON:  We do know that.  I just don't have
 6    it at my fingertips.  We can get you that information and
 7    supply it, the exact numbers.  But it's -- we do know on a per
 8    transaction basis what it is.
 9              THE COURT:  And also, how -- once you do provide that
10    number to the Court, I want to know how significantly does it
11    reduce the class members' recovery, as well, once you provide
12    the Court with the extra amount.
13              MR. PENNINGTON:  Your Honor, absolutely.  But I don't
14    think anyone is contending that the amounts paid to third party
15    vendors are recoverable by class members.  No one has made that
16    contention.
17              All of these cases acknowledge that third party costs,
18    even the cases that say there must be express authorization in
19    the note, acknowledge that costs paid to third party vendors
20    for the transaction are not fees charged by the servicer and
21    are not typically recoverable by a class member under these
22    theories.
23              THE COURT:  I understand that, but that still reduces
24    the recovery of the class so you can provide that to this Court
25    when you receive that information, as well.
```

```
 1            MR. PENNINGTON:  Yes, Your Honor.

 2            THE COURT:  Let me ask you this:  The claim process,

 3    how many class members fall within the claim process?

 4            MR. PENNINGTON:  Your Honor, it's somewhat of a

 5    moving target but as of August 21 when we filed this

 6    settlement, the number was estimated at about 22 percent or

 7    23 percent.

 8            Now, the reason it's a bit of a moving target is

 9    investors who own these loans can transfer servicing rights

10    whenever they want to.  They don't have to leave the loan with

11    the same servicer forever.

12            And so, periodically, some loans are transferred out

13    to another servicer by the investor.  And when that happens, if

14    that happens before preliminary approval, then that loan

15    becomes subject to a claim-in procedure, and so it has

16    certainly increased somewhat, but the final percentage that

17    will be subject to claim-in won't be known until the date of

18    preliminary approval.

19            THE COURT:  Well, at approximately, what, one million

20    class members, how many are no longer being serviced by PHH?

21            MR. PENNINGTON:  We can get that number as of today,

22    Your Honor.  As of August 21, it was approximately 200,000.

23    Approximately somewhere in the range of 200,000 as of the date

24    we filed the settlement.

25            THE COURT:  All right.  You can provide that later,
```

1    too.  That's fine.

2            Also, how many class members will be subject to the

3    amendment?

4            MR. PENNINGTON:  Well, Your Honor, that -- the class

5    members subject to amendment would be those who were still

6    servicing as of August 21, and so it would be that same

7    approximately 80 percent of the class that we were still

8    servicing as of August 21.  So, roughly 800,000 borrowers.  700

9    and change.

10           THE COURT:  I know it is proposed that the class

11   members will either receive 28 percent, or 18 percent.  Can you

12   tell this Court how much of the fees did PHH retain?

13           MR. PENNINGTON:  PHH and OCWEN on each transaction

14   retained all but 25 to 50 cents of the fee paid.  For online

15   transactions, there was -- you know, that fee was typically

16   $7.50, or phone payments, depending on whether it was OCWEN or

17   PHH, it was either $19.50 or $17.50, and then for IVR

18   transactions, it was $10 to $12, depending on whether it was

19   OCWEN or PHH in the time.

20           But in each case, OCWEN or PHH retained all of the fee

21   except for the third party amount paid to Western Union or ACI.

22           THE COURT:  Now, based on the past collection of the

23   fees, how much does PHH believe that it will collect in fees

24   going forward?

25           MR. PENNINGTON:  Well, Your Honor, borrowers have

 1    voted with their wallets here.  They believe these services
 2    that OCWEN and PHH are not required to offer are worth the fee.
 3         Borrowers like having the safety valve and we don't
 4    see the settlement as changing the calculus on that fact.
 5    Borrowers will still value these services.  Borrowers will
 6    still want to take advantage of these services that OCWEN and
 7    PHH aren't presently required to offer even after the note
 8    amendment.  Because all the note amendment is doing is curing a
 9    technical legal dispute.  There's no dispute that OCWEN and PHH
10    are not required to offer telephone or Internet payments at
11    all.
12         There's no dispute that every single borrower who has
13    used these services has been told what the fee is, has been
14    told that they don't have to pay this way, and that there are
15    other ways to pay, but borrowers have still voted with their
16    wallets and said you know what?  For me today, these services
17    that I don't have to use are worth the fee, and I'm going to
18    use them.
19         And they use them because they give -- as the
20    McWhorter Court found, they give borrowers a safety valve.
21    They have a way out of much, much higher late fees.  That can
22    be many multiples of the fees we're talking about here, and
23    late fees could be in excess of a hundred dollars, in excess of
24    $200, depending on the size of the payment, the monthly
25    payment.

 1          And so customers like having this option.  Other

 2     customers just like having the convenience and they use it

 3     simply for the convenience, and so we don't expect the

 4     settlement or the note amendment to change borrower's behavior,

 5     because even after the note amendment, borrowers will not be

 6     required to use these services.

 7          They will still have the option of paying by check or

 8     money order for free.  They will be told every single time that

 9     they use the service, that this is an optional service and that

10     there are lower costs and three ways to pay, that the fee if

11     you want to use these optional services is "x." And --

12          THE COURT:  Well --

13          MR. PENNINGTON:  -- they will have to individually

14     agree to the fee at the time of the transaction in addition to

15     having agreed to amend their notes in order to use the service.

16          THE COURT:  Well, I understand that.  But currently,

17     the way it's set up, they have no option.  I'm sure they can't

18     just take their loans elsewhere to servicers that charge a note

19     fee.  There are many servicers out there.  I'm sure if they had

20     the option to go with another servicer that says we're not

21     going to charge you any fee for use of the app or using the

22     phone, they would do so.

23          But I understand because what you have represented to

24     them, this is the lesser of two evils.  What they say is, well,

25     I can pay less by using your ability to pay by phone or either

```
 1    by Internet because this is what was represented to them, but
 2    rest assured, I can tell you from even a common sense point of
 3    view, if they were given the option to leave and be serviced by
 4    someone else and don't have a charge, they're not going to say
 5    we love PHH, we want to continue to give these guys money
 6    because they've been so good to us.  They would jump ship in a
 7    heartbeat.
 8         It's no different when you have cellphone companies,
 9    someone's paying double rates, someone comes in and offers you
10    a free cellphone, a free iPhone, and they're going to give you
11    half the price, I'm sure that company is going -- someone is
12    going to jump ship immediately for it.  Be that as it may, let
13    me move on to my next question.
14         Now, would you address the issue in terms of the
15    credit in terms of how, unlike the McWhorter decision, where
16    the loans -- I mean, the fees were given back to all members by
17    check.  And yet, you have it in this proposal, that it will be
18    a credit for those who have the current loan being serviced and
19    those who are not being serviced are given a check which means
20    that they don't have the discretion to dispose of the funds as
21    they see fit because the funds go towards the late fees and
22    individuals cannot -- will not have a choice to use as they see
23    fit.
24         And I get it.  You're saying, well, they have to pay
25    the mortgage but it really goes towards the late fees is my
```

1  understanding and yet, individuals do not have a discretion to

2  use it as they see fit which concerns me as far as an equitable

3  relief where no one servicer who no longer have the funds can

4  send a check as we see fit.

5          Why not issue them a check to all instead of giving

6  current loan members, saying it goes to a credit only?

7          MR. PENNINGTON:  Well, Your Honor, first of all, in

8  McWhorter, there were credits.  The loans that were still being

9  serviced by OCWEN in McWhorter received a credit.  Received a

10  credit to principal and interest, and only those who were no

11  longer being serviced were mailed a check.

12          And they were mailed a check without having to submit

13  a claim form.  And the result of that was fifty percent of

14  those checks were never cashed because those folks were no

15  longer being serviced, and despite efforts to obtain valid

16  forwarding addresses or for whatever reason, those settlements

17  simply weren't cashed.

18          So, a lot of money was spent writing checks, mailing

19  checks, remailing checks only to have fifty percent of them

20  still go uncashed.

21          And so in this settlement, we again drew basically the

22  same distinction that whether you get a credit or a check would

23  be based on whether or not OCWEN or PHH is still servicing the

24  loan.  And we decided to -- rather than automatically mailing

25  checks that may never be cashed, we asked the borrower to

1    submit a claim form providing current address information, and

2    without any onerous requirements for additional information, so

3    that we could get -- then get the check to the correct person

4    in a more efficient way.  So, that --

5              THE COURT:  Well, isn't in McWhorter, the credit went

6    towards the principal and not towards these fees?

7              MR. PENNINGTON:  Yes, I'm sorry.  It went to -- the

8    credit in McWhorter was to principal.  And --

9              THE COURT:  Well, was this towards the principal,

10   too?

11             MR. PENNINGTON:  I'm sorry, Your Honor.  I did not

12   hear that question.

13             THE COURT:  You said the credit goes towards the

14   principal in what you're proposing?

15             MR. PENNINGTON:  Your Honor, in this -- in McWhorter,

16   the credit went -- it was a credit applied against the

17   principal.

18             THE COURT:  No, I'm talking about PHH, does the

19   credit that you're proposing go towards the principal?

20             MR. PENNINGTON:  Your Honor, if there are outstanding

21   late fees, it goes -- under the terms of this settlement, it

22   goes to late fees.

23             If there are no outstanding late fees, it goes to

24   principal.  Either way, those are amounts that the borrower

25   owes.  The borrower, the note provides that the borrower will

1  pay late fees promptly.  The notes provide that late fees have

2  to be paid before the loan will be forgiven.

3       And so, these are amounts that the borrower owes, and

4  whether it's principal or late fees, the credit is simply being

5  applied to reduce amounts the borrower owes.

6       THE COURT:  Why the need for the claim form?

7       MR. PENNINGTON:  The claim form is so that we don't

8  mail out checks to stale addresses, and to people who aren't

9  going to cash them.  If people send in a claim form, they will

10  provide their correct address, and they will have taken

11  affirmative action making it clear that if we mail them a

12  check, it's going to be cashed.

13       Whereas, in the other scenario, as described, we had a

14  lot of wasted time, a lot of wasted effort and only a fifty

15  percent check cashing rate at the end of the day in McWhorter.

16       THE COURT:  What is the usual claim rate in the class

17  action on these claim forms?

18       MR. PENNINGTON:  Your Honor, it varies depending on

19  the type of case and how onerous the claim form is.  We have

20  seen claim forms, claim processes that result in claim rates in

21  the 25 percent range.  Even higher when the form was not

22  onerous and when it involves things like mortgages.

23       This a very mild claim form.  The only information the

24  customer is really required to provide is the property address

25  associated with the loan and the current mailing address, and

1    so it's not onerous.

2         And we would expect a very high claim rate and we

3    would do our best to make sure that everyone who was eligible

4    to submit a claim did.  We would do our best to make sure that

5    the notice had gotten to the proper class members.

6         THE COURT:  Also, I notice in McWhorter, there was no

7    claim form in that case, as well, is this correct?

8         MR. PENNINGTON:  That's correct, and that's because

9    that group of people, the people no longer serviced, were

10   automatically mailed checks.

11        But, again, those checks came back up undeliverable.

12   Some checks were then remailed to new addresses based on skip

13   tracing and so forth.

14        Still at the end of the day, the grand total was that

15   fifty percent of checks automatically mailed to those groups

16   without a claim form went uncashed.

17        THE COURT:  And what is the expected range of

18   recovery?

19        MR. PENNINGTON:  Expected range of recovery in

20   settlement?

21        THE COURT:  Yes.  For class members.

22        MR. PENNINGTON:  Well, some class members paid by

23   Speed Pay many, many times.  And so one class member may have

24   used this service 75 times.  Another class member may have used

25   it only once.

1        So, it's entirely dependent on the amount paid by that

2   individual class member.  And so -- and there's no per class

3   member recovery here.  It's a percentage of the fees actually

4   paid by each individual class member.

5             THE COURT:  And also in McWhorter, there was no

6   reverter, correct?

7             MR. PENNINGTON:  In McWhorter, there was no reverter,

8   but the fact remains that fifty percent of the checks did not

9   reach class members.

10        There was like 5K awarded in McWhorter, and that

11   didn't help class members.  That at the end of the day, fifty

12   percent of the checks went uncashed.  These are not fees that

13   are clearly illegal.

14        There is a roughly even split among the trial courts

15   as to whether these fees are perfectly legal even without a

16   note amendment.

17        As Adam was articulating, numerous courts, including

18   many Florida Federal Courts have held that these fees are

19   perfectly legal even without a note amendment because they are

20   entirely optional.  They're fully disclosed at the time of each

21   transaction, and the customer is given a choice as to whether

22   these optional services or not, these are services that the

23   servicer is not required to offer at all.  They're entirely

24   avoidable by the borrower.

25        And so, many courts are dismissing these claims

```
 1    outright, and holding that there is no right to recovery.  And
 2    so, there's not -- this is not a situation where OCWEN and PHH
 3    had collected fees that had been established to be illegal, and
 4    these -- the regulators are in disagreement over whether these
 5    fees are legal even without an authorization in the underlying
 6    note.
 7            The V.A. charges these fees for loans it owns.  The
 8    FDC issued guidance in 1988 contrary to the CFPB -- later CFPB
 9    later guidance.  What the FDC said because these fees are
10    entirely avoidable, as long as they're disclosed and optional
11    and the customer agrees to the fee as a condition of using an
12    extra optional service, these are not prohibited by the FDCPA.
13    So --
14            THE COURT:  So --
15            MR. PENNINGTON:  This is not a --
16            THE COURT:  If that's the case that you are confident
17    that the fees are legal, even though the Attorney Generals and
18    the courts take the different position, why have a safety valve
19    if you are comfortable they are, indeed, legal and what Court,
20    what Appellate Courts have said that they are legal?
21            MR. PENNINGTON:  No Appellate Court has said they're
22    legal.  No Appellate Court has said they're illegal without a
23    note amendment or without authorization in the underlying note.
24    So, what we have here is a legal dispute.  That's what
25    settlements are about.
```

1          Roughly half the trial courts say they have to be

2     authorized in the underlying note.  Roughly half say no, they

3     don't.  They're legal as long as they're avoidable and agreed

4     to at the time.  And so that is what settlements are all about.

5     That's the classic case for a compromise.

6          THE COURT:  This is not a garden variety settlement

7     case.  As you know, there has been no Appellate Court decisions

8     on this matter at all, and this is before this Court, it is a

9     serious matter.  As you know, not one Appellate Court has ruled

10    on this matter.  All we have is a first case issued by

11    McWhorter which is only a District Court decision, no matter --

12    pretty much in the same situation I'm in.

13          Just because the McWhorter issues his opinion first,

14    of course, doesn't make it right or even make it wrong, of

15    course.  That's why as I'm looking at this particular matter,

16    of course we have different scenarios as to what you're

17    proposing than was in the McWhorter and some were not.

18          And I understand that.  That being said, let me hear

19    from the next party, please.

20          MR. MOSKOWITZ:  Your Honor, can I just finish?  This

21    is Adam Moskowitz for the plaintiffs.  I just want to repeat

22    one thing that Mr. Pennington said.  And that is, if we could

23    get PHH and OCWEN to agree not to make these charges, of course

24    we would try to get that in a settlement.

25          And for months, we had mediation with Rodney Max, they

1    would not agree to just simply agree not to do these charges.

2    And we have to be real in terms of what the risks are in the

3    class.  That's the Eleventh Circuit standard.  We're looking

4    out for the class's best interest.  When we have cases every

5    week being dismissed in the Southern District of Florida for

6    these exact same claims, there's certainly a risk for the class

7    members.  And that's what we're trying to protect.

8         When Judge Altonaga rules you could never certify this

9    in a contested litigated class from OCWEN borrowers, there's a

10   real risk to these class members at ever getting any recovery,

11   at trial or on appeal, and this settlement is giving them

12   28 percent of their money back.

13        So, that's why I think it's an outstanding settlement

14   for them.  It's not a perfect settlement, but OCWEN and PHH

15   could certainly take the position that we're going to keep

16   fighting you, and we hope to be like Judge Moore and Judge

17   Altonaga in the Intervenor's case that was dismissed with

18   prejudice.

19        Those Federal judges, and their District Courts are

20   all saying these fees are legal.  So, we have to consider that

21   when we look for the best interests of the class to try to get

22   them some relief.  We not only get them some relief, we get

23   them 28 percent of their money back, we lower the fees for

24   online payments, we freeze the charges for three years, and we

25   make more disclosures so that people know if you're going to

1   use these optional services, there's going to be a charge but

2   you don't have to use them.

3          So, we get increased disclosures, and if they don't

4   like this settlement, they can opt out.  So, it's not a perfect

5   settlement by any means, but the case law certainly doesn't

6   require a perfect settlement.  It requires you to make a

7   compromise, and the compromise here is we're allowing them to

8   complete -- to offer these voluntary charges that you don't

9   have to do.

10          You're right, Your Honor.  If your note is serviced

11   from a different mortgage provider, they may want to charge

12   late fees.  They may not charge services for Internet or call

13   in fee.  That's their decision.  And we'd love it when they

14   decide to just agree to drop these charges, but that's not this

15   case and that's not these facts under this settlement.

16          This settlement, the defendant is not willing to just

17   drop it because the law has been pretty uniform recently

18   finding that they're legal.  Regardless of what profit they're

19   making, these fees are legal.

20          So, we look at it as our responsibility of protect the

21   class.  Do we allow the case to go forward and Judge Smith

22   dismisses the case?  Or do you grant summary judgment as many

23   courts have done recently against us?  Or do you say I'm not

24   going to certify it especially because it's a much, much larger

25   class than McWhorter and it gives relief to almost a million

```
1   people.  People who we don't know if they FDCPA claims.  We
2   don't know if their loan is in default.  You'd have to go by
3   individual by individual borrower.  So, there's a lot of
4   impediments, and we believe in these cases, we've brought six
5   of them and we've done them for ten years in the forced placed
6   insurance cases for mortgage holders around the country, but
7   there's real risks here for these class members, and we're
8   getting them real relief.  28 percent if they want it.
9           So, that's why I think it's a great settlement.  If
10  people don't want to be involved, they can opt out.  But I
11  think that the way that the law is going, it's a rising tide of
12  cases against us, so getting 28 percent back for people for
13  fees that some courts like Judge Moore are saying they're
14  perfectly legal, I think is a wonderful settlement.
15          Most Southern District cases that say 5.7 percent of a
16  refund is a good settlement.  We're getting 28 percent for
17  people that are currently serviced by PHH so --
18          THE COURT:  Thank you, sir.  But one, I'm not Judge
19  Moore.  Two, I have not dismissed any of these cases, as well.
20          And also, with respect to the servicer, these
21  individuals, do they have an opportunity to opt out?  Haven't
22  they been in a long service with PHH?
23          MR. MOSKOWITZ:  I think a person that has his loan
24  serviced by PHH could do whatever they want with their loan.  I
25  don't know what's precluding somebody from saying I don't want
```

1    you to service my loan anymore, but I mean, all we have to go

2    with is this settlement, Your Honor.

3         Of course, this Court is not Judge Moore and/or the

4    other 17 cases that we cite in our footnote.  I would like

5    nothing more than to keep doing these cases to fight PHH, to

6    get the class certified and to make an incredible relief for a

7    million class members.  I would love that.  But I have to be a

8    realist and I have to look when there's 17 other courts that

9    are dismissing this exact claim, that there is a risk here.

10        I would love nothing more than to go forward with Your

11   Honor, to beat them -- beat them a lot like we did in forced

12   placed for ten years.

13        But, unfortunately, a lot of the other judges on this

14   Court are holding that we don't even state a cause of action,

15   let alone what's down the road which is summary judgment,

16   certification, appeals for many years.

17        So, what are these people going to get eventually?

18   Even the Attorneys General entered a consent decree allowing

19   these charges, so what are we going to get for them?  So, the

20   question is does this fall within the range of reasonableness?

21   I don't think that could be in dispute.  It clearly falls

22   within the range.

23        And I think we should hear from the million class

24   members.  What do they think?  You know, I read all the

25   briefings by the DOJ and the AG that say they want to enforce

1   their own laws and their own claims.  That's not this case.

2          Let them bring their own case.  They have already.

3   This case is about a private litigant's right to sue under the

4   FDCPA against OCWEN, and I'm just being a realist in saying

5   that a majority of the courts now are holding that that doesn't

6   even state a cause of action, so that's a risk for me.

7          I'd love it if Your Honor denies the motion to

8   dismiss, denies the summary judgment, certifies the nationwide

9   class, we'll go to a trial, we'll win, but those are risks that

10  we have to take.

11         And under a settlement, you have to negotiate.  And

12  the good part about the opt out, Your Honor, is anyone who

13  doesn't want to be part of this note amendment or this

14  settlement could just opt out.

15         So, I don't know why we can't just at least hear the

16  class's reaction.  They're the ones being affected.  Not the AG

17  or the DOJ.  They don't have standing.  The courts have said

18  they can't object so they're not affected.  They could just

19  give their thoughts.

20         But why don't we hear from these million class

21  members.  Maybe a lot of them will say I don't like it, and

22  then the Court can say you know what?  I've heard from the

23  class and it's just not right, but to say there's no risk here

24  when the Intervenors' own case was dismissed with prejudice.

25  There's clearly a risk of getting the motion to dismiss or

1    summary judgment or not certified.

2            So, I would respectfully ask, Your Honor, it's not a

3    perfect settlement.  It's not everything we wanted, but they

4    did agree to give up 28 percent of what they've made on these

5    fees, what people have paid and I think that's a wonderful

6    settlement.

7            They're not going to increase the amounts and they're

8    going to decrease the amounts if you use the Internet.  So that

9    costs them less to do.  They don't have people answering phones

10   for that.

11           So, I would respectfully, very respectfully suggest

12   that the risks are definitely there, they're real, and we as

13   class counsel need to consider them and that this settlement

14   falls within the range of reasonableness so at least we can let

15   the class be heard.  Clearly, there's no collusion.  We have

16   Rodney Max who was one of the best mediators in the country who

17   was selected by the Intervenors, so there's no collusion so why

18   wouldn't we at least send out notice to the class and get their

19   opinion?  That's what we'd respectfully ask, Your Honor.

20           MR. PENNINGTON:  Your Honor, if I could follow up.

21   This is Mike Pennington for the defendants again.  If I could

22   just follow up just very briefly on a couple of points that

23   Adam made.

24           THE COURT:  Sure.

25           MR. PENNINGTON:  First, the cases that have refused

```
 1    motions to dismiss have done only that.  They haven't reached
 2    final judgment determining that these fees are illegal.  They
 3    have simply said the case can proceed past the motion to
 4    dismiss stage.
 5         The cases that have gone our way on these fees have
 6    actually dismissed the claims with prejudice, and that's the
 7    50/50 split that we're seeing out there among the trial courts.
 8         The servicer is chosen by the investor, not the
 9    borrower.  The borrower owes the investor.  The investor
10    chooses the servicer and the servicer services the loan on
11    behalf of the investor.
12         No borrower has ever been required to use these
13    services.  Every time a borrower uses these services, they know
14    they can mail a check for free.  They know they can send a
15    money order without a fee from OCWEN or PHH.
16         So, every borrower that uses these services in the
17    past and in the future, knows those things, knows there's free
18    and lower cost options, and they know they can even pay for
19    free online and by phone if they enroll in paperless billing.
20    So they have options.  Every single borrower has these options.
21         And they've chosen to make these one-time Internet and
22    phone payments in exchange for this fee, knowing full well what
23    the fee is.  And the fact that they've done it so many times is
24    certainly evidence that they value the services.  Services that
25    we are not required to offer at all.
```

1          THE COURT:  I get that, sir.  I understand it.
2    Again, as I mentioned before, because they have basically no
3    choice.  And if anyone was given a choice to have their loan
4    serviced by a servicer that does not provide any fee, I doubt
5    seriously that someone's going to say I'm so in love with PHH
6    that I want to give them $7.50 or even consent to $19.50 which
7    is meaningless to me, it doesn't matter.
8          At any rate, let me hear from the other parties, the
9    Intervenors.  Thank you.
10          MR. KAUFFMAN:  This is James Kauffman.  I represent
11    the class member Intervenors.  My class member Intervenors are
12    from two states, Texas and Florida.  It's really unprecedented
13    here to have a preliminary approval with this many different
14    objecting participants.  It includes counsel who are litigating
15    other cases, a coalition that is bipartisan of 33 Attorneys
16    General, and the United States Department of Justice.
17          Now, really the issue here is that the parties have
18    had an ample opportunity to address the criticisms of those
19    objecting participants, but they haven't done so.  And Your
20    Honor has raised certain things that information that was
21    lacking but, respectfully, there are some things that frankly
22    cannot be fixed.  And for whatever reason, even things that can
23    be fixed, the parties have refused to do so.
24          What is important here is whether there's adequate
25    consideration, Your Honor, and frankly, through this

 1    settlement, the parties are accomplishing for PHH a note

 2    amendment and a sweeping relief that it could not accomplish

 3    had it not been sued in the first place.  And really this goes

 4    back to the plaintiff's original complaint, Docket Entry

 5    Number 1.

 6           And the reason why I think it's important for the

 7    Court not just to hear from class members, but also to hear

 8    from others who are knowledgeable, is the plaintiffs' complaint

 9    in paragraph 12 highlights an issue.

10           The original issue was that there was a -- known

11    within the payment processing industry, is what it says, that

12    there was a very small amount that PHH would pay to a third

13    party processor, and then it would mark it up many times beyond

14    that, an illegal markup, and charge someone $19.50.

15           Now, we've heard now today for the first time that PHH

16    has admitted that that amount was between 25 and 50 cents.  So,

17    it's paying 25 and 50 cents to a third party vendor and then

18    it's going to charge $6.50, $7.50 and then up to $19.50 to

19    class members for using the same service.

20           One thing that you didn't hear is that in December,

21    PHH announced a mobile app for all of its borrowers.

22    Presumably, this settlement and this note amendment will be

23    foisted upon the class members, so that every time they use the

24    mobile app to pay, something that is a fractional cost to PHH

25    and probably even less than the 25 to 50 cents we're hearing,

1    PHH is going to collect $19.50 every single time.

2         And something that is important here, Your Honor, is

3    that there actually have been other settlements in this space,

4    and there are decisions in other courts, and those decisions

5    have been resoundingly favorable for plaintiffs in both

6    California and Texas.

7         There are seven other settlements and four of which

8    I'm proud to say that I'm class counsel for.  Those seven

9    settlements include the McWhorter case, but every case since

10   McWhorter has not included a note amendment.  None of them can

11   include a reverter.  None of them include this process where

12   the late fees are credited first.

13        And, frankly, they're all much superior.  The range of

14   recovery for the class in those settlements is between 30 and a

15   hundred percent.  Now, we keep hearing 28 percent.  We've heard

16   Mr. Moskowitz say it probably no less than six times I've

17   counted.

18        You have heard today that the amount collected from

19   the class was somewhere between 70 and $80 million.  12.5

20   million dollars is not 28 percent of 70.  It's not 20 percent

21   of 80 million.  It is 15 to 18 percent.  So, let's stop saying

22   it's a 28 percent settlement when it's really not.

23        Mr. Moskowitz knows these numbers and for some reason

24   he keeps saying it's a 28 percent settlement.  This is a 15 to

25   18 percent when every other pay to pay settlement, seven of

 1  them are between 30 and 100 percent.

 2          Also, in two of my settlements, most recently against

 3  Arvest Mortgage and against Statebridge Mortgage, as part of

 4  the settlement, the servicer agreed, and we accomplished

 5  exactly what is best for the class which is injunctive relief

 6  in both Texas and California, and in very -- in several other

 7  states, the class members are entitled to injunctive relief to

 8  actually stop the fee on a going forward basis.

 9          That's what we have accomplished with regard to Arvest

10  and Statebridge.  Statebridge was a hundred percent recovery,

11  of the fee and an agreement to not charge for three years.

12          Arvis which is a larger servicer, is a fifty percent,

13  49.7 percent recovery, with an agreement for the loan servicer

14  to not charge for any of these payment methods for a period of

15  three years.

16          Now, here, what is important is in our reply at Docket

17  Entry number 104, we've given the Court an example of and a

18  chart of 15 servicers just by surveying the biggest servicers

19  in the country that do not charge these fees.  15 of them,

20  these include Bank of America, this includes Chase, this

21  includes Quicken Loans, some of the biggest players in this

22  space, none of them charge for these fees.

23          There are a total, and PHH and the plaintiffs have had

24  ample opportunity to identify other servicers who charge these

25  fees.  There are a total of four.  And frankly, those four are

1    trending towards not charging the fee at all going forward.

2         Now why is that?  Because with the case law in Texas

3    is not split, Your Honor.  It's not split at all.  There are

4    four Texas decisions in pay to pay fees that have each overcome

5    the motion to dismiss where the Court has signaled that this is

6    a statutory violation and frankly, it's a plain statutory

7    violation.  We're confident that there will be summary judgment

8    on these claims.

9         But nevertheless, there's not a single Texas adverse

10   ruling when it is on summary judgment, a motion to dismiss, at

11   any stage for these pay to pay fees in any court under the

12   Texas statute.  And that is why my Intervenors do not want be

13   subject -- have objected to this settlement because frankly,

14   it's taking the complete opposite stance from the way that the

15   Texas Courts are moving and have spoken.

16        Those decisions include the Caldwell case versus

17   Freedom Mortgage, the Dees versus Nationstar Mortgage, the

18   Barnett case versus Caliber Home Loans and the Williams case

19   versus Lakeview and Loan Care.

20        Mr. Moskowitz is perfectly aware of the Loan Care

21   case, because in front of Judge Altonaga, he argued that he was

22   the prevailing party in that case because during the pendency

23   of his action, Loan Care decided to stop charging October 22,

24   2020.  And he claimed in that case that he was the prevailing

25   party as a result.

```
 1            Here, he is doing the complete opposite and frankly,

 2    giving defendants everything that they're asking for in this

 3    settlement.  All you have to do is look at the typical recovery

 4    of a potential class member.

 5            Take Mr. Thompson who paid one fee of $7.50.  What

 6    will happen here?  $7.50, there will be an amount that's

 7    reduced for whatever amount was paid to the third party and

 8    then it will be an 18 percent recovery because Mr. Thompson is

 9    not part of the very small group of the class that fits into

10    the 28 percent.  And they haven't explained to you, Your Honor,

11    exactly how many class members are in the 28 percent and how

12    many class members are in the 18 percent.

13            But he's in the 18 percent.  And in exchange for

14    basically reducing that by 18 percent, that on top of that, it

15    may further be reduced by attorney's fees obviously so he can

16    expect to get a check of roughly 94 cents.

17            Now, of course, in McWhorter, that was a settlement

18    that was twice as favorable to class members as this one.  This

19    is a 15 to 18 percent.  McWhorter was a 30 percent.  Fifty

20    percent of the people didn't cash their checks and that's

21    frankly, because if it was $1.80, which would be double that

22    amount, you know, it's -- I could see the likelihood of someone

23    thinking, well, I'm not going to cash my check.  It's not

24    really worth the trip to the bank.

25            Now, in exchange for that, that 94 cents, the class
```

1    member is going to agree to pay PHH up to $19.50 every time

2    they use online, phone, or when they roll out this -- or they

3    actually have rolled out this mobile app, when they start

4    paying through the mobile app.  Now, here, you've asked what I

5    think is a good question.  That's part of my lack of

6    information section, is asking, well, what is the value?  What

7    has PHH, what does it expect to recover under the note

8    amendment?  Now, there's a simple answer to that.

9            In McWhorter, they know the class members.  They know

10   who has paid since then.  How much money did they make off the

11   McWhorter amendment?  How much money have they made in the two

12   years since McWhorter?  That's enlightening, Your Honor,

13   because frankly, for the person receiving 94 cents, they're

14   going to pay $20 profit every time they pay to OCWEN.  That's

15   grossly disproportional, and it's something that cannot be

16   fixed.  The class member is going to invariably receive much

17   less than what they're going to pay in the future.  And

18   frankly, this is something that just can't be changed.

19           The other thing that I would say with regards to the

20   lack of information is on top of the cases that have ranged

21   from 30 to a hundred percent, this case is 15 to 18 percent,

22   and then you factor in the reverter.  You heard the estimate

23   being 20 to 25 percent.  It's probably a fair estimate.  Let's

24   say there's a quarter of these class members.

25           So, a quarter of this money is going to be part of the

1    claims made process and they haven't given you a claims rate,

2    but I will not imagine that the claims rate will be very high

3    and so that money will revert back to OCWEN.

4             That will further reduce the expected recovery of the

5    class.  So, now we're not talking about 15 to 18 percent.

6    We're talking about a ten percent recovery or a ten to 12

7    percent recovery in that situation.

8             And, frankly, there's a lack of information with

9    regard to that.  Now why?  Why has this information not been

10   made directly to the Court?  These objections have been made,

11   these criticisms have been made and yet, the parties have still

12   not given this information to the Court?

13            And the plain truth is that this is not favorable

14   information to the settlement.  As the Court uncovers more

15   information about this settlement, the more it stinks.  And,

16   frankly, that is why the Court continues to have these

17   questions at preliminary approval.

18            And here, I think that it's important to note that in

19   giving preliminary approval, the Court is saying that it could

20   likely give final approval.  That barring any objections, the

21   Court is prepared to give final approval to the settlement and

22   here, there's not even a discussion about the range of recovery

23   and the Court is still asking questions about the proper range

24   of recovery, and there's still information to basically

25   illuminate what the actual recovery could be for a class member

1    and what that looks like compared to the other settlements.

2          Other settlements that are between 30 and a hundred

3    percent with injunctive relief on top of that.  This settlement

4    is nowhere even in the universe of those cases.

5          Final thing that I want to discuss is how we got here,

6    Your Honor, was this was a case that was filed originally by

7    Mr. Morris as a Florida only case.

8          During settlement negotiations, it was transformed

9    into a nationwide action, nationwide relief to give -- frankly,

10   to give OCWEN everything that it was seeking.  It wanted a note

11   amendment.  It got a note amendment.  It wanted a reverter.  It

12   got a reverter.  It wanted there not to be checks to be sent

13   out to people, because then you'd have to account for the

14   uncashed checks.  It wanted to credit it.  It got that.

15         It wanted to credit it towards late fees first, so

16   that goes directly into OCWEN's pocket, right back into OCWEN's

17   pocket because it's entitled to the late fees on this.

18         So, the money goes right back to OCWEN.  The

19   defendants took advantage of the plaintiffs at every turn in

20   this negotiation, Your Honor.  And this was an expanded class

21   where the class members were in it for 14 days.  Now, why is

22   that?

23         Well, some of the class representatives aren't even

24   class members here.  The California class rep, it's not even

25   his home.  It's his parents' home.  The home is not located in

1   California.  It's in Nevada.  He's not even a signatory to any

2   of the security instruments.  Yet, he purports to amend not

3   only his parents' loan I guess, who are I guess would be class

4   members, but everyone else in the country.

5         Not only that, but he sat down and fiercely negotiated

6   this settlement with the defendant.  That's clearly not evident

7   from the settlement terms, all of which have broken the

8   defendants' way, Your Honor.

9         So, I ask that -- I know that the Court will give the

10  opportunity for more information.  It sounds like that, but

11  frankly, there are some things that cannot be fixed, Your

12  Honor.  This is a broken -- this was a below zero settlement,

13  frankly, Your Honor.  This is -- the class members would be

14  better off walking away from this settlement than engaging in

15  it, and for those reasons, I ask the Court deny preliminary

16  approval.

17        THE COURT:  Also, let me ask this question, too.

18  What happens with respect to the administrative fees?  Is that

19  paid throughout the settlement or is that separate like it was

20  in McWhorter?

21        MR. PENNINGTON:  Separate, Your Honor.

22        THE COURT:  I didn't hear you.

23        MR. PENNINGTON:  They're paid separately.

24        THE COURT:  All right.  I already heard from the

25  Intervenors.  Anyone else wish to be heard at this point?  AG?

 1            MS. LYNCH:  Your Honor, Your Honor, yes, if I may.

 2    This is Elizabeth Lynch.  May I just have a few moments of your

 3    time?

 4            THE COURT:  Sure.

 5            MS. LYNCH:  Thank you.  I just wanted to start by

 6    thanking the Court for granting us leave to file our Amicus.

 7    As you can see, 33 states have signed onto this Amicus opposing

 8    this proposed settlement, and before I focus on the main thrust

 9    of our argument which is going to be talking about the statute

10    of frauds, and talking about the PHH consent judgment, I just

11    want to briefly bullet point just why exactly this settlement

12    is a bad deal for homeowners.

13            First, PHH is a mortgage servicer.  So, that means it

14    is their job is to accept payments from homeowners, not to make

15    it more difficult or expensive for homeowners, especially since

16    many in the industry, Bank of America, Wells Fargo, Chase,

17    Caliber, Quicken, are not charging these fees and as Your Honor

18    correctly noted, homeowners can't opt out of being customers of

19    PHH.  They are stuck with PHH.  They really don't have a choice

20    in the matter.  They can't go to Wells Fargo.  They can't go to

21    Bank of America.

22            Second, the proposed settlement would authorize what

23    the complaint alleged would be legal, which is the charging the

24    of these convenience fees not written into the contract with

25    little to no benefit to homeowners.

```
 1            As the Intervenors noted, there's really no change in

 2   the fee structure here.  There's maybe a decrease for online

 3   fees of a dollar after three years, and then after that, all of

 4   these fees can be charged up to $19.50, and this is all

 5   happening with automated payments becoming the norm that these

 6   are charged by other industries.  Credit cards do not charge

 7   these fees for automated payments even with an online account

 8   or through IVR.  My electric bill, my cable bill, I pay that

 9   all from my bank account through an online transfer and I'm not

10   being charged fees.

11            And then in addition to that, the monetary benefit

12   provided to homeowners here is really miniscule, if not

13   non-existent for those homeowners who are still PHH customers

14   and their credit goes to late fees.

15            And I think a lot of the questions you asked about

16   exactly what people will be getting, even an estimate, could be

17   helpful in us understanding this more.  And we also look

18   forward to plaintiffs and defendants providing us more

19   substance about that.

20            But a third issue that makes this a bad deal for

21   homeowners is that the proposed settlement treats some classes

22   differently which isn't allowed under Rule 23, especially after

23   the 2018 amendment that cite a subprocess has to be treated

24   equitably.

25            It's here, current PHH customers get a credit, former
```

1    ones get a check.  A check is always money in your pocket is

2    usually always better than money that's credited, especially

3    when it's credited toward late fees.

4         Another reason why this is bad for homeowners is that

5    these unnecessary fees basically penalize those homeowners who

6    have the greatest difficulty in making timely payments.  Mostly

7    working class homeowners.  I think it's important to remember

8    that PHH is choosing which type of methods of payment to charge

9    these fees.

10        They're not charging fees for automatic debit, even

11   though that's an online based process as well.  They're not

12   charging fees to automatic debit.  They're charging fees to

13   people who pay online, who need maybe a little bit of extra

14   time before the late fee is incurred to make those payments.

15        Plaintiffs and defendants have not explained why

16   they're not charging fees for automatic debits but for online

17   payments, they are.

18        And I would just like to note that I know

19   Mr. Pennington said that late fees are a hundred to $200.  As

20   somebody who's been doing mortgage issues for over a decade,

21   I've never seen a monthly late fee more than $35 or $45.

22        Fifth, I think the benefit here far outweighs the

23   benefit to homeowners.  I mean, what we've heard today is that

24   PHH would profit handsomely from setting these fees at $19.50,

25   still 25 to 50 cents that a third party vendor, that means

```
 1    there's about $19 of profit in their pocket and in addition to

 2    that, there's a reverter here.  That's money that's not going

 3    to the class.  That's money that's going back to PHH's pocket

 4    and as you've noted, this is -- the current PHH borrowers did

 5    not see any money to be credited to late fee.  This was not

 6    what happened in McWhorter where it was credited to principal.

 7              And then, finally, the settlement parties are

 8    basically asking this Court to approve this settlement with a

 9    mass unwritten, unsigned amendment basically because it would

10    be a cost savings to PHH.

11              And our statute of frauds in 50 states don't allow

12    that.  So, just to take a step back, the statute of frauds

13    isn't just some archaic statute that doesn't really have any

14    relevance to today's world.

15              It's a statute that where we have stated that there

16    are just contracts that are so important, that they must be in

17    writing and one of those contracts are contracts related to

18    real property.  It's important that this be in writing for

19    homeowners.  For most homeowners, this is the most important

20    contract, this is the most important purchase of their lives.

21              It's important for banks that it be in writing.  As we

22    show is in our Reply Amicus, where OCWEN and PHH have

23    repeatedly argued for these listing of statute of frauds and

24    also important for our economy, the ability to purchase and

25    sell real property in a transparent market is very important.
```

1        Similarly, most state statute of frauds do not allow

2   any sort of modification without it being in writing and

3   signed, and defendants know that.  They, along with the

4   plaintiffs, are trying to argue that for some reason the

5   statute of frauds only applies to the mortgage, not to the note

6   part of the mortgage.  But they have argued repeatedly

7   throughout the country that the statute of frauds in whatever

8   states, including Florida, applies to them, and they have

9   repeatedly won on that.

10       So, they argue that the statute of frauds applies when

11  it suits them.  But here, when it doesn't suit them, when it's

12  a little convenient to ignore it, they're arguing otherwise.

13  The statute of frauds does not allow to just pick and choose

14  when it's convenient for the bank.

15       Also, as we note in our Amicus Reply, many of the

16  statutes specifically they apply to notes, promises and

17  Promissory Notes, and those that don't have an explicit

18  statement in the statute through case law, they've applied it

19  to notes.

20       The only basis the settling parties provide for an

21  unwritten mass unsigned amendment to over 650,000 mortgages

22  throughout the country is a District Court decision in Alabama.

23       But even as the McWhorter Court noted in that

24  decision, the single objector, a Maryland homeowner who raised

25  the statute of frauds issue at the fairness hearing, the

1    amendment did not even apply to her.

2           So she -- so, it isn't really persuasive authority.

3    It's really basically dicta.  And if you dig a little bit

4    deeper into the reason behind those judges' decisions, the

5    judge doesn't look at Maryland law completely.

6           There's a statute under Maryland law, the banking

7    regulation, which explicitly states that convenience fees and

8    any fees must be written into the contract and signed by the

9    borrower.

10          So, we don't think McWhorter has any place here.

11   I will note that the settling parties do cite another case that

12   applies to mortgages for its contention that unwritten,

13   unsigned mass amendments are somehow okay under this statute of

14   frauds.  We've looked into that case.  We can't find that it

15   actually was an unassigned amendment, as we noted in our

16   Amicus, so we don't think that's relevant.

17          And because the statute of frauds is very, very clear,

18   that's why I think the settling parties keep bringing up this

19   PHH consent judgment.  It's basically a distraction.

20          Even if you take Mr. Moskowitz's and Mr. Pennington's

21   arguments about the consent judgment at face value, we still

22   have a statute of fraud count that can't be overcome.

23          But I just want to make it clear, I know Mr. Moskowitz

24   said that the consent judgment, the PHH consent judgment that

25   the state AGs entered into in 2018, somehow allowed these fees.

```
 1   It didn't allow these fees, and he knows that because if it did

 2   allow these fees, why does he bring this class action in the

 3   first place?

 4          The consent judgment, all it did was -- it did not

 5   address the legality of these convenience fees, or pass any

 6   judgment on it.  It did not legalize these fees in the states

 7   where they were already illegal.  After signing the consent

 8   judgment, they're still illegal in those states.  It merely

 9   provided that if you are going to charge these fees, you have

10   to provide certain disclosures.

11          In fact, if we look at the PHH consent judgment, it's

12   clear that PHH must still comply with all state and Federal

13   law.  So, in Texas, in Maryland, in New York where the law is

14   very clear that you can't charge these fees if it's not written

15   into the contract, it was illegal before signing the PHH

16   consent judgment, and it's still illegal after signing the PHH

17   consent judgment.  And defendants know this because the

18   defendants are not charging fees in 16 states.

19          While they don't state specifically why they aren't

20   charging these fees, I think we can assume that at least for

21   some of them, it's because the fees are illegal in those

22   states.

23          Also, if the PHH consent judgment somehow magically

24   legalized these fees in violation of state law, then they

25   wouldn't be seeking this unwritten, unsigned amendment of 650
```

1   mortgage contracts.

2          I know that they have -- the settling parties or the

3   plaintiffs have added to the docket a supplemental authority

4   the decision that was recently heralded down in CFPB versus

5   OCWEN.  I think like what's clear in that decision -- first

6   off, the Court was very clear on page seven, that the

7   settlement did state that OCWEN had an ongoing obligation to

8   not violate state and Federal laws.  And I'll quote:  The Court

9   stated there's a standard, OCWEN needs to supplement, not

10  supplant OCWEN's obligations under the law.  And the same is

11  true here.

12         As to any res judicata effect that they're trying to

13  argue by analogy to this consent judgment, I think that Court

14  was very clear, as well, that if it arises out of the same

15  operative facts, then they need to be res judicata.  But here,

16  the issue of convenience fees was never brought up in the

17  complaint or the causative action in the PHH consent judgment

18  that the settling parties keep citing to.

19         Similarly, the Court in the CFPB case, noted that the

20  issue of mortgage insurance was not res judicata by the

21  previous settlement.  And, therefore, that was allowed to go

22  forward.

23         And finally, just in concluding, that case, CFPB

24  versus OCWEN case, is procedurally in a completely different

25  place from us.  That was an enforcement action.  We're filing

1    an Amicus.  That was an enforcement action where the Court

2    noted that CFBP had another avenue by which to bring an

3    enforcement action and that was spelled out in that settlement

4    agreement.  Mainly, going through the DC District Court.

5          Here, we're just filing -- this is a class action

6    settlement that is before this Court, and so we are filing an

7    Amicus to oppose a settlement predominantly because it violates

8    50 states statute of frauds, and that's why we think the Court

9    should not approve the settlement.  Thank you.

10         THE COURT:  Thank you.  What are some of the states

11   that these fees are illegal, you said?  You said there was 16,

12   right?

13         MS. LYNCH:  So, the defendant PHH's Affidavit, the

14   exhibit to Affidavit in its response to the AG's Amicus, she

15   states I think in paragraph 9, that there are 16 states where

16   they do not charge these fees.  She doesn't say exactly why the

17   states don't charge these fees, which states.  We think it's

18   probably because they're illegal.  We know they're illegal in

19   Texas under Texas law.  We know they're illegal in Maryland

20   under Maryland law.  We know they're illegal in New York under

21   New York law.  So, we believe that there's probably judgments

22   that it's illegal that are in place, confirmed illegal in the

23   16 states.

24         THE COURT:  Well, what impact, if any, will the

25   amendment affect those who are residents of those particular

1    states?

2           MR. PENNINGTON:  Your Honor, this is Mike Pennington

3    for the defendant.  The answer is it would not because the

4    reason we don't charge in those 16 states is because they have

5    statutes that expressly state, or laws that expressly state

6    that even if the underlying loan agreement provides for

7    convenience fees, you cannot charge them in this state.

8           And so having an amendment in those states does not

9    alter that statutory prohibition or that regulatory prohibition

10   on charging convenience fees whether or not they're authorized

11   in the underlying note.

12          MS. LYNCH:  Your Honor, if I may, Elizabeth Lynch

13   again from New York.  You know, I mean, I think that raises a

14   really interesting question because you're also kind of

15   confused and don't really know what to make of it.

16          Mr. Pennington is saying that 16 states have clear

17   statutory authority that doesn't allow these fees but yet,

18   every single state has class members.  New York has a very

19   large number of class members and our laws have been on the

20   books since I believe 2012, since the last financial crisis

21   where you can't charge these fees.

22          Texas, their Fair Debt Collection Practices Act, I

23   think the last time it was amended, it was in 2005.  This was

24   like way before the class even existed.  So, I do wonder, you

25   know, like what -- why we're seeing class members in states

1    where it's already clearly illegal.  Irregardless of that, I

2    mean, this proposed settlement violates the statute of frauds

3    for 50 states.

4           THE COURT:  All right.  Let me hear from Mr. Hixson,

5    if he wishes to speak at this point for the United States.

6           MR. HIXSON:  Thank you, Your Honor.  Yes.  David

7    Hixson on behalf of the United States.  And I'll keep this

8    brief because I think many of our objections, our concerns have

9    been covered by Your Honor and by the other parties.

10          But, you know, we filed our statement of interest now

11   at the preliminary approval stage because it appears to us that

12   this settlement falls outside the range of reasonableness and

13   could not ultimately be approved.

14          And also, I'll focus on two issues that we've talked

15   about in our statement of interest.  The first is that the note

16   amendment is harmful to the class members, and the second is

17   that applying settlement credits to the late fees first is just

18   one example of the many ways in which this settlement benefits

19   PHH greatly at the expense of class members.

20          So, on the note amendment, it's harmful for the very

21   simple reason that it puts class members in a worse position.

22   Under the status quo, PHH charges convenience fees the class

23   members can challenge under the FDCPA or state law.

24          The settlement would set in stone that PHH can

25   continue charging these fees in the future, but class members

```
 1   would no longer be able to challenge them so this loss of class
 2   member rights while still being subject to the convenience
 3   fees, plainly puts class members in a worse position than
 4   they're in today.
 5           And so this is easy when you start looking at how it's
 6   going to play out in practice.  You take the example of a class
 7   member who makes a payment over the phone using the assistance
 8   of a live operator.
 9           In the past, they'd charge -- they'd be subject to a
10   $17.50 charge, but they can contest that subsequently under the
11   FDCPA.  Going forward, that same class member making the same
12   type of payment would be subject to at least the same $17.50
13   payments, but the class member would no longer have any ability
14   to challenge the fee.
15           And in addition, by legalizing PHH's fees, the
16   settlement not only does away with the class member's
17   individual claims, it also would immunize PHH from the ability
18   of Federal and state authorities to enforce the FDCPA or many
19   state laws, so class members wouldn't have the backstop anymore
20   of the regulatory enforcement for supervision, and the CFPB,
21   through its multiple bulletins dealing with late fees -- it is
22   active on this front, and I think overall, under the
23   settlement, Your Honor has already keyed in on that point.
24           That class members will pay much more in future fees
25   than they're going to get back through credits, so it's an
```

```
 1    overall shift of not only payments but also a release of claims

 2    in PHH's favor.

 3            And I echo the other objector's concerns about doing

 4    this through a class action.  This settlement would, if

 5    approved in one fell swoop, rewrite over 650,000 mortgage loans

 6    and take away rights from more than 900,000 consumers.

 7            The unnamed class members have really no input on

 8    this.  They're not the parties negotiating settlement, and we

 9    cited a Law Review article and a Seventh Circuit opinion noting

10    that virtually no one opts out of consumer class actions.

11            I believe the Law Review article said that the median

12    opt out rate for FDCPA class actions is 0.0 percent.  So, in

13    all reality, the unnamed class members are going to be bound by

14    this and lose contractual rights and not receive any benefits.

15            And so that's why I think as the Intervenors have

16    already made the point, that this case very -- is very

17    different from other cases where courts have approved

18    settlements modifying contracts where the contractual changes

19    remedied the defendant's conduct that was in dispute and

20    clearly benefited class members.

21            The Salem decision that would lower the interest rate,

22    and the Carter decision that enhanced warranty coverage.  The

23    Adams decision that expanded healthcare coverage.  In each

24    case, consumers were clearly better off in the offending

25    conduct with the draft not codified.
```

 1           Now, there's a couple of rebuttals also that you've

 2    heard, and I really want to focus on two points that the

 3    settling parties have made.  The first, in their brief, their

 4    response to our statement of interest, they suggest the United

 5    States' statement of interest is based on the assumption that

 6    these fees are unlawful under the FDCPA, and that we're

 7    ignoring contrary case law.  That's not our point.

 8           Our point is that these claims are supported by a

 9    substantial case law which we've cited in our reply and as well

10    as the CFPB's bulletin on this.  And so that these claims have

11    a reasonable to strong likelihood of prevailing, and that they

12    have value and shouldn't be released without compensation.

13           And as counsel from New York has already stated,

14    there's also the state law issues, which I don't think the

15    settling parties have really addressed how strong class

16    members' claims are there.

17           And also, counsel suggested that regulators are split

18    on interpreting the FDCPA as to convenience fees.  I don't

19    believe that's correct.

20           First of all, CFPB has sole interpretive authority and

21    the ability to write rules under the FDCPA, and no other agency

22    has ever had general rule writing ability and it's made its

23    position pretty clear through the bulletins it's issued.

24           The V.A. does have regulations on convenience fees but

25    they don't address the FDCPA, don't purport to override the

1    FDCPA's specific prohibitions on debt collectors collecting

2    these fees, nor do they appear to have a preemption clause that

3    would do away with state law protections.

4         And the FTC staff commentary, it's important to note

5    that this was always nonbinding staff commentary by the agency

6    without rule making authority, but even that, if you read

7    carefully, it says that these fees are unlawful.

8         It says that this provision of the FDCPA, Section

9    808.1 -- and I can provide this in a supplemental.  I know it

10   can be difficult to follow along regulatory language that we

11   haven't put in front of the Court, but it says the kinds of

12   amounts covered include any incidental charges such as

13   collection charges, interest service charges, late fees and bad

14   check handling charges.

15        It goes on to say that a debt collector can collect a

16   convenience fee or a bad check fee if the merchant, if the

17   original creditor had an agreement with the consumer, not that

18   the debt collector entered into an agreement with the consumer.

19        And Judge Middlebrooks in his Fusco decision, made

20   this point and came to the same conclusion.  So, really there

21   is no difference among regulators on how to view this.

22        And the primary argument that the settling parties

23   have made is that the note amendment is beneficial because it

24   simply preserves a service that PHH doesn't have to offer, that

25   it merely gives class members the option to pay by certain

1    methods, and class members don't have to use it if they don't

2    want to.

3         Recall that this is -- PHH is not offering a novel or

4    unique payment service.  Accepting online and telephone

5    payments is standard in the servicing industry, and across

6    consumer financial services generally.

7         What's not standard is the fee that PHH charges.  The

8    Intervenors both today and in their reply brief pointed to

9    other servicers who don't charge a fee or even among those who

10   do, PHH is at the highest level.

11        And Your Honor has already I think touched on the lack

12   of choice that class members have, and that -- their payment of

13   these fees in the past hasn't necessarily meant that they

14   approve of convenience fees.

15        This is just to tease out why we think with the Orkin

16   decision, the Eleventh Circuit's decision is so instructive is

17   that it helped demonstrate the difference between theoretical

18   choice and having actual reasonable alternatives.  And so in

19   Orkin, it involved contracts for extermination services and

20   Orkin unilaterally increased its renewal fees in excess of what

21   the contract allowed.

22        So, in theory, consumers don't have to purchase

23   extermination services.  They don't have to pay that higher

24   fee.  Some did though, and the Eleventh Circuit didn't get

25   bogged down by hypotheticals and theoretical outcomes and noted

1    Orkin's customers couldn't have obtained the same services for

2    the same price as from a competitor so quote, customers did not

3    have any real alternative to paying the increased renewal fees,

4    end quote.  And that's at 1358 of the Orkin decision.

5         And really the same is true here in theory.  Class

6    members don't have to make online or telephone payments and in

7    theory, they don't have to pay the fee if they think it's too

8    high, but in practice, online and telephone payments are

9    standard ways for consumers to make payments and class members

10   really don't have a way to avoid this convenience fee practice.

11        They didn't agree to pay convenince fees in the

12   mortgage loans, they never negotiated the prices with PHH.

13   They're extremely unlikely to opt out of the settlement, and as

14   Your Honor noted, class members can't switch to another

15   servicer.  So, just as in Orkin, there's no competitor, there's

16   no market check on these fees.

17        So, both here and in Orkin, the consumers really don't

18   have a real alternative but to pay the fee for a standard

19   service.  And so for those reasons, we think that the note

20   amendment is harmful to class members and precludes a finding

21   that the settlement is reasonable.

22        And on the other issue, very briefly on the credits

23   being applied to late fees first.  As other parties have

24   discussed, these are a profit center for PHH, whereas credit to

25   principal wouldn't have the same benefit to PHH, but it could

```
 1   help a borrower make a timely payment and avoid future late

 2   fees.

 3           And as far as I understand, PHH has never disclosed

 4   what portion of late fees it typically forgives or otherwise

 5   can't collect through, for example, if the loan goes through

 6   foreclosure.  And so it may well be that many of these credits

 7   are going to apply to fees that PHH might not have collected

 8   outside of the litigation.

 9           So, overall, when you look at the legalization of

10   PHH's convenience fee practice applying the credits to late

11   fees, the other issues that the parties have talked about about

12   the claim requirement for former borrowers and the reverter,

13   all of this shows that there's a great deal of benefit to PHH

14   but very little benefit, if any, to current PHH borrowers.  So

15   thank you, Your Honor.

16           THE COURT:  Also, I want to make sure you file a

17   supplemental brief as well of the authority that you just

18   mentioned.

19           With that said, the Court, again, has requested

20   certain things that it wants to review from the parties.  You

21   can submit as well and I'll give you until Friday to -- this

22   Friday to submit that for the Court.

23           MR. MOSKOWITZ:  Thank you, Your Honor.

24           MR. PENNINGTON:  Thank you, Your Honor.

25           THE COURT:  Thank you.  Have a good day.
```

1          MS. LYNCH:  Thank you for the opportunity.

2                         - - -

3          (Proceedings adjourned at 11:30 a.m.)

4

5

6

7

8

9                    C-E-R-T-I-F-I-C-A-T-E

10

11         I hereby certify that the foregoing is an accurate

12   transcription of the proceedings in the above-entitled matter.

13

14

15   APRIL 14, 2021.        /s:/Ellen A. Rassie_____
                            ELLEN A. RASSIE, RMR-CRR
16                          Official Court Reporter
                            To the Honorable Rodney Smith
17                          299 East Broward Blvd., Room 202A
                            Ft. Lauderdale, Florida  33301
18                          (954)769-5440

19

20

21

22

23

24

25